1  LINDA M. DARDARIAN, CA Bar No. 131001
   NINA RABIN, CA Bar No. 229403
2  GOLDSTEIN, DEMCHAK, BALLER,
      BORGEN & DARDARIAN
3  300 Lakeside Drive, Suite 1000
   Oakland, CA 94612
4  (510) 763-9800
   (510) 835-1417 (fax)
5  ldar@gdblegal.com
   nrabin@gdblegal.com
6
   MICHAEL R. LOZEAU, CA Bar No. 142893
7  LAW OFFICES OF MICHAEL R. LOZEAU
   1516 Oak Street, Suite 216
8  Alameda, CA 94501
   (510) 749-9102
9  (510) 749-9103 (fax)
   mrlozeau@lozeaulaw.com
10
   Attorneys for Plaintiff CALIFORNIA
11 SPORTFISHING PROTECTION ALLIANCE

12 PAUL P. "SKIP" SPAULDING, III, CA Bar No. 83922
   DAVID J. LAZERWITZ, CA Bar No. 221349
13 FARELLA BRAUN & MARTEL, LLP
   235 Montgomery Street
14 San Francisco, CA 94104
   (415) 954-4400
15 (415) 954-4480 (fax)
   sspaulding@fbm.com
16 dlazerwitz@fbm.com

17
   Attorneys for Defendant
18 MERIDIAN GOLD COMPANY, INC.

19                    UNITED STATES DISTRICT COURT

20                    EASTERN DISTRICT OF CALIFORNIA

21

22
   CALIFORNIA SPORTFISHING PROTECTION ) Case No.: 1:06-cv-00023-REC-LJO
23 ALLIANCE, a non-profit corporation,    )
                                           ) **[PROPOSED] CONSENT AGREEMENT
24               Plaintiff,                ) AND ORDER**
                                           )
25 vs.                                     ) Federal Water Pollution Control Act, 33 U.S.C.
                                           ) §§ 1251 to 1387;
26 MERIDIAN GOLD COMPANY, a corporation    )
                                           ) California Health and Safety Code, § 25249.5;
27               Defendant.                )
                                           ) Resource Conservation and Recovery Act, 42
28 _____) U.S.C. §§ 6901 to 6692

FILED

JUN 8 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
         DEPUTY CLERK

1    **WHEREAS**, California Sportfishing Protection Alliance ("CSPA") is a non-profit public
2    benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife,
3    and natural resources of California's waters.

4    **WHEREAS**, Meridian Gold Company, Inc. and its related or affiliated entities, including
5    Meridian Beartrack Company (collectively "Meridian"), formerly operated the Royal Mountain King
6    Mine, which is located at 4461 Rock Creek Road near the City of Copperopolis, California. Meridian
7    has been performing management, reclamation and closure of the Royal Mountain King Mine site
8    ("RMKM Site") from the late 1980s to the present.

9    **WHEREAS**, CSPA and Meridian shall sometimes be referred to herein individually as "Party"
10   and collectively as "Parties."

11   **WHEREAS**, Meridian conducted gold mining, including heap leach mining, at the RMKM
12   Site from 1988 to July 1994. During active mining, approximately 56 million tons of ore and
13   overburden were removed from three mining pits at the site. Seven Waste Management Units
14   ("WMUs") remain at the site. These include a former mining pit now filled with a combination of
15   wastewater, groundwater and storm water known as Skyrocket Pit Lake and three overburden disposal
16   sites ("ODSs"): Gold Knoll ODS, Flotation Tailings Reservoir ODS, and West ODS, all of which
17   consist of discarded waste rock excavated from active mining pits. The other three WMUs are
18   engineered WMUs known as the Process Water Pond, the Leached Concentrates Residue Facility, and
19   the Flotation Tailings Reservoir. The entire RMKM Site shall sometimes hereinafter be referred to as
20   the "Facility." A map of the RMKM Site is attached hereto as Exhibit A and is hereby incorporated by
21   reference.

22   **WHEREAS**, the Federal Water Pollution Control Act, also known as the Clean Water Act
23   ("CWA"), prohibits persons from discharging pollutants from point sources to waters of the United
24   States without obtaining a National Pollutant Discharge Elimination System ("NPDES") permit. 33
25   U.S.C. § 1311(a).

26   **WHEREAS**, the California Safe Drinking Water and Toxic Enforcement Act of 1986
27   ("Proposition 65") prohibits businesses from knowingly discharging or releasing listed chemicals into
28   water or onto land where it passes or probably will pass into a source of drinking water. Cal. Health &

1  Safety Code § 25249.5.

2  **WHEREAS**, the federal Resource Conservation and Recovery Act ("RCRA") prohibits the
3  owner or operator of a treatment, storage, or disposal facility from contributing to the past or present
4  handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may
5  present an imminent and substantial endangerment to health or the environment. 42 U.S.C. §
6  6972(a)(1)(B).

7  **WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant
8  to the NPDES, General Permit No. CAS000001 [State Water Resources Control Board], Water Quality
9  Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued
10  pursuant to Section 402 of the CWA, 33 U.S.C. § 1342 (hereinafter "General Permit").

11  **WHEREAS**, on June 1, 2005, CSPA and Watershed Enforcers provided to Meridian a written
12  notice of alleged violations of the CWA, Proposition 65, RCRA and the General Permit and notified
13  Meridian therein of CSPA's intention to file suit against Meridian ("CSPA Notice Letter"). The CSPA
14  Notice Letter was sent to the Administrator of the United States Environmental Protection Agency
15  ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources
16  Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board,
17  Central Valley Region ("Regional Board"); and to Meridian, pursuant to Section 505 of the CWA, 33
18  U.S.C. § 1365, Cal. Health & Safety Code § 25249.7(d)(1), and 42 U.S.C. § 6972(b)(2)(A) of RCRA.
19  A true and correct copy of the CSPA Notice Letter is attached hereto as Exhibit B, and is hereby
20  incorporated by reference.

21  **WHEREAS**, on January 6, 2006, CSPA filed a Complaint against Meridian in the United
22  States District Court, Eastern District of California, alleging violations of the CWA, Proposition 65
23  and the General Permit.

24  **WHEREAS**, on April 6, 2006, CSPA filed a First Amended Complaint ("Complaint") against
25  Meridian in the United States District Court, Eastern District of California, alleging violations of the
26  RCRA in addition to the existing allegations.

27  **WHEREAS**, Meridian denies CSPA's allegations that it has violated the CWA, Proposition
28  65, RCRA and/or the General Permit and denies that it has any liability whatsoever to CSPA. The

1  Parties agree that nothing in this Consent Agreement and Order ("Consent Agreement") shall be

2  construed as, and Meridian does not intend to imply, any admission as to any fact, finding, issue of

3  law, or violation of law, nor shall compliance with this Consent Agreement be construed as an

4  admission by Meridian of any fact, finding, conclusion, issue of law, or violation of law.

5  **WHEREAS**, on July 29, 2005, Meridian submitted an application for a NPDES permit to the

6  California Regional Water Quality Control Board, Central Valley Region ("Regional Board"). On

7  September 29, 2005, Meridian submitted a revised NPDES permit application to the Regional Board.

8  **WHEREAS**, the Parties anticipate that the Regional Board will consider Meridian's

9  application and propose issuance of a NPDES permit for the Facility on a schedule that has not yet

10  been determined.

11  **WHEREAS**, the Parties believe the upcoming NPDES permit proceeding before the Regional

12  Board provides an appropriate forum for the Parties to address many of the technical issues raised by

13  the CSPA Notice Letter and Complaint.

14  **WHEREAS**, the Parties believe that the NPDES permit process will also address the

15  Proposition 65 and RCRA allegations regarding discharges into surface water.

16  **WHEREAS**, the Parties have decided that it is in the best interests of both Parties to resolve

17  the litigation without the taking of any evidence or findings of fact or law, and the Parties would like to

18  avoid prolonged and costly litigation.

19  **WHEREAS**, this Consent Agreement shall be submitted to the United States Department of

20  Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c), and the other

21  procedures in 33 U.S.C. § 1365 associated with approval of consent agreements shall be followed.

22  **WHEREAS**, CSPA shall follow the procedures set forth in Cal. Health & Safety Code

23  § 25249.7 for notice and approval of a proposed settlement, and the Court shall make the requisite

24  findings set forth in section 25249.7(f)(4).

25  **NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING**

26  **PARTIES, AND ORDERED BY THE COURT, AS FOLLOWS:**

27  **I.    COMMITMENTS OF MERIDIAN**

28  **A.    NPDES Permit, Proposition 65 and RCRA Claims**

1        1.       The Parties agree that Meridian shall obtain a NPDES permit for discharges at the
2   Facility as soon as possible. The Parties recognize that the Regional Board, and possibly the State
3   Board, will control the timing, evaluation and issuance of this permit. Meridian and CSPA agree that
4   they shall jointly advocate for the earliest possible issuance of this permit by these agencies. Neither
5   Party will be in violation of any obligation in this paragraph if it utilizes any administrative procedure,
6   including an administrative appeal, available to it under law regarding the NPDES permit.

7        2.       CSPA and Meridian agree to inform and facilitate the issuance of Meridian's NPDES
8   permit for the Facility by establishing a process whereby the Parties, their counsel, and their scientific
9   experts meet together, attempt to reach consensus, and jointly or separately provide comments and
10  otherwise assist the Regional Board and/or State Board in the upcoming proceeding to issue a NPDES
11  permit for the Facility. Meridian agrees to make a one-time financial payment to CSPA in the amount
12  of $120,000 for the purpose of paying the estimated costs of CSPA and its experts' participation in this
13  process. Meridian shall pay this sum to CSPA within 30 calendar days of the Effective Date of this
14  Consent Agreement, and CSPA shall create a "Meridian Permit Issuance Fund" to hold these monies.
15  CSPA's use of the Meridian Permit Issuance Fund shall be limited to the expenses for: (1) CSPA's
16  activities relating to the Regional Board's proceeding to issue a NPDES permit for the Facility; (2)
17  CSPA's activities relating to any subsequent administrative appeal to the State Board; and (3) CSPA's
18  activities regarding the General Permit set forth in Paragraphs 9 through 14. CSPA may use up to
19  $15,000 of the Meridian Permit Issuance Fund to support its non-legal staff time and costs related to
20  the above listed activities. The remaining portion of the fund will support the expenses of its scientific
21  experts. All expert fees paid for by the Meridian Permit Issuance Fund shall be based on rates not to
22  exceed the reasonable hourly rates as set forth in Exhibit C, attached hereto and hereby incorporated by
23  reference, or as reasonably increased by the experts once at the end of each calendar year following the
24  Effective Date of this Order. The Parties agree that Meridian shall have no obligation or liability to
25  pay CSPA, its experts, or its attorneys any additional monies relating to this expert participation
26  process, including any expert fees, even if these administrative proceedings are more complicated or
27  more protracted than the Parties currently estimate they will be, except as specifically provided in
28  Paragraph 20.

1    3.    In an effort to resolve any issues that may arise regarding the terms of any NPDES

2 permit proposed by the Regional Board, the Parties, accompanied by their duly retained experts, and,

3 as each Party deems necessary, their counsel, agree to meet as follows:

4    a.    Within 30 days of the Effective Date of this Consent Agreement, the Parties and

5 their experts shall meet to discuss and try to resolve any differences or issues they have relating to the

6 terms of the proposed NPDES permit for the Facility.

7    b.    After the Parties have their initial meeting, they shall seek a preliminary scoping

8 meeting with Regional Board staff and the Parties to discuss the Parties' views on the appropriate

9 terms of a proposed NPDES Permit for the Facility. Either Party may also seek and hold separate

10 meetings or communications on this or other subjects with the Regional Board or State Board, or their

11 staff, at any time.

12    c.    The Parties shall request that the Regional Board provide the Parties with a draft

13 tentative NPDES permit at least 45 days prior to the Regional Board's issuance of any proposed permit

14 duly noticed for public comment and hearing. Within 21 days of the release of any such draft tentative

15 permit by the Regional Board, the Parties, including their experts, shall meet to discuss the terms of the

16 draft tentative permit. During the meeting, the Parties shall attempt in good faith to resolve any

17 disagreements they may have over the proposed terms of the draft tentative permit. The Parties shall

18 prepare a set of joint comments setting forth those issues relating to the terms of the draft tentative

19 NPDES permit on which they agree and those issues relating to the terms of the draft tentative NPDES

20 permit on which they could not reach a consensus. The Parties shall submit joint comments to the

21 Regional Board within 14 days of meeting and conferring on the draft tentative permit. Along with the

22 comments, the Parties shall jointly seek a meeting with the Regional Board's staff in order to discuss

23 the joint comments prior to the date the Regional Board is expected to release a proposed NPDES

24 permit for public comment. Either Party may also seek and hold separate meetings or communications

25 on this subject with the Regional Board or State Board, or any Board staff, at any time.

26    d.    Not later than 14 days from the Regional Board's publication of a notice

27 requesting public comment on a proposed NPDES permit for the Facility, the Parties shall meet and

28 confer to discuss the terms of such proposed NPDES permit, and prepare joint comments consistent

5

with the procedures set forth in the immediately preceding paragraph. Although the Parties shall not be required to seek a meeting with Regional Board staff during the public comment period, they may seek such a meeting in their discretion, jointly or separately.

e.     In addition to the above required meetings, the Parties agree to engage in additional conversations and meetings to attempt in good faith to resolve any outstanding issues relating to the terms of any proposed NPDES permit for the Facility. The Parties also agree to facilitate contacts between their respective experts, including by telephone or in person, to discuss technical issues relating to the terms of any draft or proposed NPDES permit. The Parties retain the right to listen in or otherwise be present during any contact between the Parties' experts, or during any contact of the experts jointly with the Regional Board or State Board, or their staff. Either Party may also seek and hold separate meetings or communications on these subjects with the Regional Board or State Board, or their staff, at any time.

4.     CSPA shall not advocate in any forum, including before the Regional Board or State Board in any permit or enforcement proceedings, that Meridian install any additional liners or caps on the Facility's ODSs or WMUs, and CSPA shall not use any moneys from the Meridian Permit Issuance Fund for this purpose. CSPA also agrees not to provide technical assistance or funding to any other person to advocate for the implementation of additional liners or caps on ODSs or WMUs at the Facility. CSPA is not precluded, however, from advocating for the use of additional or alternative surface management features other than caps and liners on the Facility's ODSs. CSPA also is not precluded from discussing the installation of liners and caps with third parties, so long as it does not solicit the third party to do the advocacy that CSPA agrees it will not do directly and does not provide any third party with financial support or technical assistance in its efforts relating to the installation of liners and caps on ODSs or WMUs at the Facility.

5.     CSPA shall not use any moneys from the Meridian Permit Issuance Fund for costs, fees, or any other expenses incurred by or on behalf of any other organization or person appearing before the Regional Board or State Board, other than CSPA's own non-legal staff and designated experts. CSPA shall not use any moneys from the Meridian Permit Issuance Fund for costs, fees or any other expenses related to any subsequent court challenge to a NPDES permit issued for the Facility. Any

1   residual funds remaining in the Meridian Permit Issuance Fund on the termination date of this Order
2   shall be paid by CSPA to the entity identified in Paragraph 15 below, subject to the use restrictions and
3   conditions set forth in Paragraphs 16 and 18, on the date of termination.

4   6.   At the end of the administrative process, when either the Regional Board or, if an
5   appeal has been taken, the State Board has acted in final form, and consistent with the timeline set
6   forth in Paragraph 3, CSPA will provide a report to Meridian and the United States Department of
7   Justice listing the number of hours, multiplied by the hourly rate, of each CSPA staff member and
8   expert who participated in the administrative process, and designate the remaining amount, if any, to
9   be paid to the entity identified in Paragraph 15, below.

10  **B.   General Industrial Storm Water Permit Claim**

11  7.   In order to prevent storm water from coming into contact with contaminants at the
12  Facility and/or to prevent the discharge of waste, contaminated storm water and unauthorized non-
13  storm water from the Facility into the waters of the State and of the United States, Meridian shall
14  implement structural and non-structural best management practices ("BMPs") that are equivalent to the
15  best available technology economically achievable ("BAT") and the best conventional pollutant
16  control technology ("BCT") at the Facility. Meridian shall maintain all structural BMPs at the RMKM
17  Site in good operating condition.

18  8.   By August 31, 2006, Meridian shall update the Facility's Stormwater Pollution
19  Prevention Plan ("SWPPP") prepared pursuant to the General Permit to incorporate all BMPs currently
20  in place at the Facility. A copy of the amended SWPPP shall be sent to CSPA within seven (7) days of
21  completion.

22  9.   The Parties agree that, within thirty (30) days of the written request of CSPA, they shall
23  jointly conduct an in-person visit to the RMKM Site. Such request by CSPA shall not be made prior to
24  July 1, 2007 nor, unless agreed to by the Parties, subsequent to 60 days from CSPA's receipt of
25  Meridian's 2006-2007 Annual Report prepared and submitted pursuant to Section B(14) of the General
26  Permit. The purpose of the visit shall be for CSPA to review the SWPPP and site conditions at the
27  Facility to determine what, if any, further storm water structural BMPs it believes may be appropriate

28

7

1  for areas at the Facility subject to regulation under the General Permit. Within thirty (30) days of this
2  site visit, CSPA and Meridian shall confer, either in person or by telephone, to discuss any
3  recommendations for structural BMPs that CSPA believes are appropriate in such areas. The Parties
4  shall affirmatively seek a consensus to implement further structural BMPs, and if such a consensus is
5  reached, Meridian shall implement those BMPs as soon as reasonably practicable. The Parties agree
6  that, if they cannot reach a consensus on whether any structural BMPs should be implemented:
7  (A) Meridian shall not be obligated under this Consent Agreement to implement any other structural or
8  non-structural BMPs at the RMKM Site; and (B) CSPA shall not make any motion to the court under
9  this Consent Agreement or institute any other kind of legal proceeding of any kind to compel the
10  adoption or implementation of any structural or non-structural BMPs at the RMKM Site during the
11  term of, or based on any activities or events occurring during the term of, this Consent Agreement.

12       10.    Meridian shall collect samples from the monitoring locations at the Facility set forth in
13  the storm water monitoring program attached as Exhibit D.

14       11.    Meridian shall collect four samples from each of the monitoring locations set forth in
15  Exhibit D during four separate rain events. Meridian will attempt to collect samples during two rain
16  events in the 2005-2006 wet season and two rain events in the 2006-2007 wet season. If Meridian is
17  unable to collect two samples during the 2005-2006 wet season for any of the specified locations, the
18  number of missed samples shall be taken from such locations during rain events in the 2006-2007 wet
19  season, so that a total of four samples are taken at each of the monitoring locations by the end of the
20  2006-2007 wet season. Each storm water sample shall be analyzed for the constituents set forth in
21  storm water monitoring program attached as Exhibit D. If a particular sampling location does not
22  exhibit any flows during two consecutive sampling events, Meridian shall no longer be required to
23  conduct sampling at that location. The samples shall be taken and analyzed consistent with the
24  technical sampling and analysis protocols of the General Permit.

25       12.    Meridian shall maintain a log that measures the amount of daily rainfall occurring at the
26  Facility. Such log shall be made available to CSPA within ten (10) days after receipt of a request.

27       13.    Results from Meridian's sampling and analysis shall be provided to CSPA within
28  fourteen (14) days of receipt of the final written laboratory report from each sampling event.

14. Meridian shall permit representatives of CSPA to perform up to one (1) site visit to the Facility per calendar year in 2007 and 2008 during normal daylight business hours during the term of this Consent Agreement, provided that CSPA provides Meridian with at least thirty (30) days' prior written notice of the site visit and all CSPA site visit participants execute Meridian's site access and non-liability agreement.

## II. MITIGATION PAYMENTS, FEES AND COSTS

15. As mitigation of the violations of the CWA and, in the alternative, RCRA alleged in the CSPA Notice Letter and Complaint, Meridian shall pay the sum of $177,500 to the Rose Foundation (hereinafter "Foundation") to fund locally-based, water quality related projects in the Littlejohns Creek watershed, the lower San Joaquin River or its tributaries, or the southern portion of the Sacramento-San Joaquin River Delta. Such projects shall be limited to those focusing on creation or restoration of riparian areas, environmental education, environmental research, public health, and fish and wildlife. None of this monetary payment shall be used to fund litigation, direct regulatory advocacy or lobbying activities.

16. As mitigation of the violations of Proposition 65 alleged in the CSPA Notice Letter and Complaint, Meridian shall pay the sum of $177,500 distributed as follows: 75 percent of the payment mitigating the alleged violations of Proposition 65 ($133,125) shall be paid to the Foundation to fund locally-based, water quality related projects in the Littlejohns Creek watershed, the lower San Joaquin River or its tributaries, or the southern portion of the Sacramento-San Joaquin River Delta. Such projects shall be limited to those focusing on creation or restoration of riparian areas, environmental education, environmental research, public health, and fish and wildlife. None of this monetary payment made pursuant to this Agreement shall be used to fund litigation, direct regulatory advocacy or lobbying activities. The remaining 25 percent ($44,375) of the payment shall be paid to CSPA consistent with Health and Safety Code § 25249.12(d).

17. Meridian shall make the payments required by Paragraphs 15 and 16 within thirty (30) days of the Effective Date of the Consent Agreement.

1    18.    Payments to the Foundation shall be subject to the following conditions: (a) the

2    payments or any portion thereof shall not be disbursed or otherwise granted directly or indirectly to

3    CSPA; (b) projects funded by the payments shall be designed to benefit water quality in the Littlejohns

4    Creek watershed, the lower San Joaquin River or their tributaries or the southern portion of the

5    Sacramento-San Joaquin River Delta; (c) they shall be earmarked for creation or restoration of riparian

6    areas, environmental education, environmental research, public health, and fish and wildlife, but not

7    litigation, direct regulatory advocacy or lobbying activities; and (d) one year from the effective date of

8    the Consent Agreement, and each year thereafter on such date until such time as all of the payments to

9    the Foundation has been awarded to qualifying grant recipients, the Foundation shall submit an annual

10    report to the Parties, describing the amount and recipients of each grant made from the payment.

11    19.    Meridian shall reimburse CSPA in the amount of $275,000 to defray CSPA's

12    investigation fees and costs, expert fees and costs, reasonable attorneys' fees, and all other costs

13    incurred as a result of investigating the activities at the Facility, providing notice to Meridian, filing

14    and pursuing the Complaint, negotiating a resolution of this action in the public interest, and

15    monitoring and implementing the terms of this Consent Agreement, except as provided in Paragraph

16    20, below. Such payment shall be made within thirty (30) days of the Effective Date of the Consent

17    Agreement. CSPA agrees that Meridian shall not have any future obligation to pay any attorneys' fees

18    and costs incurred by CSPA during any administrative proceedings relating to any permits for the

19    Facility, including for the expert process set forth in paragraphs 2-6 herein.

20    **III.    DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

21    20.    If a dispute under this Consent Agreement arises, or if either Party believes that a

22    breach of this Consent Agreement has occurred, the Parties shall hold a meeting within thirty (30) days

23    of receiving written notification from the other Party of a request for a meeting. This notification shall

24    explicitly state the nature, underlying facts and legal grounds for the dispute or alleged breach. At this

25    meeting, the Parties shall discuss the merits of the dispute and whether a violation has occurred, and

26    they shall seek to develop a mutually agreed upon plan, including implementation dates, to resolve the

27    alleged violation or dispute. If the Parties fail to meet and confer or if the meeting does not resolve the

28

1   issue, and after at least seven days have elapsed since the meet and confer occurred or should have

2   occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a

3   motion before the United States District Court for the Eastern District of California, which shall retain

4   jurisdiction over the action for the limited purposes of enforcement of the terms of this Consent

5   Agreement. The Parties shall be entitled to seek fees and costs incurred in any such meet and confer

6   and/or motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the

7   Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such

8   provision, including that the Court shall award reasonable attorneys' fees and costs to Meridian if it

9   prevails in the dispute and the Court concludes that CSPA's action to enforce the Consent Agreement

10   was frivolous, unreasonable or without foundation.

11       21.     Upon Court approval and entry of this Consent Agreement, CSPA, on its own behalf

12   and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys,

13   representatives, and employees, as well as on behalf of Watershed Enforcers (which CSPA verifies has

14   been merged into CSPA and no longer exists as an independent entity), releases all persons, including

15   Meridian and its officers, directors, employees, shareholders, agents, attorneys, representatives,

16   affiliated companies, parents, subsidiaries, predecessors, successors and assigns, past and present,

17   from, and waives all claims, whether known or unknown, anticipated or not anticipated, actual or

18   contingent, suspected or unsuspected, for injunctive relief, damages, penalties, fines, sanctions,

19   mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum

20   incurred or claimed or which could have been claimed in this Action, or which was alleged in the

21   CSPA Notice Letter, including but not limited to the alleged failure of Meridian to comply with the

22   Clean Water Act (33 U.S.C. §§ 1251, et seq.), Proposition 65 (Health and Safety Code, §§ 25249.5, et

23   seq.), the Porter-Cologne Water Quality Control Act (Water Code, §§ 13000, et seq.), including the

24   General Industrial Permit, or RCRA (42 U.S.C. §§ 6901, et seq.) at the Facility (hereinafter "Claims"),

25   up to the date this Consent Agreement terminates as provided in Paragraph 28, except as specifically

26   provided for in Paragraph 20 of this Consent Agreement. This release includes a release, and covenant

27   not to sue, for any claims of injunctive relief, damage, penalties, fines, sanctions, mitigation, fees

28   (including fees of attorneys, experts and others), costs, expenses or any other sum incurred or claimed

1    or which could have been claimed with respect to any Meridian activities at the Facility in alleged

2    violation of the Clean Water Act, Proposition 65, the Porter-Cologne Water Quality Control Act,

3    including the General Industrial Permit or any successor General Permit, or RCRA that may arise

4    during the term of this Consent Agreement up to its termination, except as specifically provided for in

5    Paragraph 20 of this Consent Agreement. The Parties further expressly waive any rights or benefits

6    available to them under the provisions of California Civil Code § 1542, which provides as follows:

> A general release does not extend to claims which the creditor does
> not know or suspect to exist in his favor at the time of executing
> the release, which if known by him must have materially affected
> his settlement with the debtor.

10    22.    Upon Court approval and entry of this Consent Agreement, Meridian, on its own behalf

11    and on behalf of its officers, directors, employees, shareholders, agents, attorneys, representatives,

12    affiliated companies, parents, subsidiaries, predecessors, successors and assigns, releases CSPA (and

13    its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives,

14    and employees) past and present, from, and waives all claims, whether known or unknown, anticipated

15    or not anticipated, actual or contingent, suspected or unsuspected, which arise from or pertain to this

16    Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses

17    or any other sum incurred or claimed or which could have been claimed for matters associated with or

18    related to this Action, except as specifically provided for in Paragraph 20 of this Consent Agreement.

19    23.    CSPA will dismiss its Complaint with prejudice after the Court approves and enters the

20    Consent Agreement. To implement this provision and to ensure that the Court retains subject matter

21    jurisdiction to enforce the Consent Agreement, the Parties will file with the Court a proposed form of

22    Stipulation and Order which shall provide: (A) for dismissal of the Complaint and all claims therein

23    with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and (B) that the Court shall retain

24    and have jurisdiction over the Parties with respect to enforcement of the Consent Agreement.

25    24.    The United States District Court for the Eastern District of California shall retain and

26    will have jurisdiction over all of the Parties to this Consent Agreement for the resolution of any

27    disputes that may arise under this Consent Agreement. Each Party, on behalf of itself and its

28    successors or assigns, expressly consents to the jurisdiction of the United States District Court for the

1 Eastern District of California for these purposes. Any Party claiming that another Party has failed to
2 comply, after attempting to work out disputes informally utilizing the mechanism in Paragraph 20 may,
3 by motion, ask the Court approving this Consent Agreement to enforce the Consent Agreement
4 obligations. The Party bringing the motion shall carry the burden of proof to demonstrate that the
5 other Party is in breach of its Consent Agreement obligations.

6     25.     The Parties enter into this Consent Agreement for the purpose of avoiding prolonged
7 and costly litigation. Nothing in this Consent Agreement shall be construed as, and Meridian expressly
8 does not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor
9 shall compliance with this Consent Agreement constitute or be construed as an admission by Meridian
10 of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not
11 diminish or otherwise affect the obligations, responsibilities, and duties of the Parties under this
12 Consent Agreement.

13             **IV.    MISCELLANEOUS PROVISIONS**

14     26.     The Effective Date shall be the date that the Court enters an order approving this
15 Consent Agreement.

16     27.     For the purposes of this Consent Agreement, the Parties stipulate that the United States
17 District Court for the Eastern District of California has jurisdiction over the Parties and subject matter
18 of this Action. The Parties stipulate that venue is appropriate in the Eastern District of California. The
19 Parties further stipulate for purposes of this Consent Agreement that the Complaint states a claim upon
20 which relief may be granted against Meridian pursuant to Section 505 of the Clean Water Act, 33
21 U.S.C. § 1365, Proposition 65, Cal. Health & Safety Code § 25249.5, and RCRA, 42 U.S.C.
22 § 6972(a)(1)(B), and that CSPA has standing to bring this action.

23     28.     The Consent Agreement shall continue in effect until September 15, 2008 or thirty (30)
24 days after the issuance of a final NPDES permit for the Facility and the conclusion with prejudice of
25 any administrative appeal of said NPDES permit, whichever is the later event, and it shall
26 automatically terminate on that date.

27
28

1    29.    During the term of this Consent Agreement, each Party shall provide the other Party

2  with a copy of all documents submitted to the Regional Water Quality Control Board and/or the State

3  Water Resources Control Board regarding Meridian's NPDES permit application and all documents

4  and reports submitted to the Regional Board and/or State Board as required by the General Permit.

5  Each Party shall send such documents and reports to the other Party, via first class mail or email

6  transmission, contemporaneously with its submission to such agency.

7    30.    Any notices or other documents required or provided for by this Consent Agreement or

8  related thereto that are to be provided to either of the Parties pursuant to this Consent Agreement shall

9  be sent by both facsimile or e-mail transmission and first-class mail to each of the following

10  representatives of the Parties. Notice shall be deemed to be given and received on the date received by

11  facsimile or e-mail transmission, if such notice is given by facsimile or e-mail transmission to all

12  recipients between 9:00 a.m. and 5:00 p.m. Pacific Standard Time ("PST") on a business weekday. If

13  notice is given by facsimile or e-mail transmission after 5:00 p.m. PST on a weekday or on a weekend

14  day, notice shall be deemed received on the next succeeding weekday. Notices or documents for

15  CSPA shall be sent to:

16        Bill Jennings, Executive Director
          California Sportfishing Protection Alliance
17        3536 Rainier Road
          Stockton, CA 95204
18        Fax: 209-464-5174
          E-mail: deltakeep@aol.com
19
     With copies sent to:
20
          Linda M. Dardarian, Esq.
21        Nina Rabin, Esq.
          Goldstein, Demchak, Baller, Borgen & Dardarian
22        300 Lakeside Drive, Suite 1000
          Oakland, CA 94612
23        Fax: (510) 835-1417
          E-mail: ldar@gdblegal.com
24              nrabin@gdblegal.com

25        Michael R. Lozeau, Esq.
          Law Office of Michael R. Lozeau
26        1516 Oak Street, Suite 216
          Alameda, CA 94501
27        Fax: (510) 749-9103
          E-mail: mrlozeau@lozeaulaw.com
28

                                                14

1   Notices or documents for Meridian shall be sent to:

2           Edgar A. Smith
            Vice President Operations
3           Meridian Gold Inc.
            9670 Gateway Drive, Suite 200
4           Reno, Nevada 89521
            Fax     (775) 850-3756
5           E-mail:  edgar.smith@meridiangold.com

6   With copies sent to:

7           Paul P. Spaulding, III, Esq.
            David J. Lazerwitz, Esq.
8           Farella Braun + Martel, LLP
            235 Montgomery Street , 17th Floor
9           San Francisco, CA  94104
            Fax: (415) 954-4480
10          Email: sspaulding@fbm.com
                   dlazerwitz@fbm.com
11
            James E. Good, Esq.
12          Gresham Savage Nolan & Tilden PC
            550 East Hospitality Lane, Suite 300
13          San Bernardino, CA  92408-4205
            Fax:    (909) 888-2120
14          E-Mail:  jim.good@greshamsavage.com

15          Each Party shall notify the other Parties of any change in their contact information within 14

16   days of any such change by using the procedures set forth in this paragraph.

17          31.    No Party shall be considered to be in default in the performance of any of its obligations

18   when a failure to perform is due to circumstances beyond the Party's reasonable control, which shall

19   be referred to as a "Force Majeure."  A Force Majeure event renders performance impossible,

20   impracticable, or unduly burdensome, and includes such events as an act of God, war, fire, earthquake,

21   flood, unusually severe weather conditions, strikes, lockouts and restraint by court order or public

22   authority.  A Force Majeure event does not include normal inclement weather, such as anything less

23   than or equal to a 50 year/24 hour storm event, or inability to pay.  A Force Majeure event does include

24   any actions, delays or decisions by a government agency, including the Regional Board or the State

25   Board, which delays or precludes a Party's ability to perform a Consent Agreement obligation in a

26   timely manner.  Any Party seeking to rely upon this paragraph shall have the burden of establishing

27   that it could not reasonably have been expected to avoid, and which by exercise of due diligence has

28   been unable to overcome, the Force Majeure.  If a Party seeks to invoke this paragraph, it shall notify

1   the other Party in writing as soon as reasonably possible, specifying the particular action that could not
2   be performed and the specific reason for the non-performance. The Parties will thereafter meet and
3   confer regarding an alternative schedule for completion of the action that could not be performed, or an
4   alternative action. Any dispute regarding the applicability of this paragraph, or any future action to be
5   taken, that remains after the meet and confer session will be handled as a dispute pursuant to Paragraph
6   20.

7   32.   The Parties may execute and deliver this Consent Agreement in one or more
8   counterparts or copies, and each counterpart shall be deemed and original and, taken together, shall be
9   deemed to be the entire document.

10   33.   The Parties' signatures to this Consent Agreement transmitted by facsimile shall be
11   deemed binding.

12   34.   In the event that any of the provisions of this Consent Agreement is held by a court to
13   be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

14   35.   The language in all parts of this Consent Agreement, unless otherwise stated, shall be
15   construed according to its plain and ordinary meaning.

16   36.   The undersigned are authorized to execute this Consent Agreement on behalf of their
17   respective Parties and have read, understood and agreed to all of the terms and conditions of this
18   Consent Agreement. CSPA also affirms that it is authorized to enter into this Consent Agreement on
19   behalf of the organization known as Watershed Enforcers, and that Watershed Enforcers will be bound
20   by the terms of this Consent Agreement.

21   37.   This Consent Agreement shall be governed by, and construed and interpreted in
22   accordance with, the laws of the State of California.

23   38.   All agreements, covenants, representations and warranties, express or implied, oral or
24   written, of the Parties concerning the subject matter of this Consent Agreement are contained herein.

25   39.   If for any reason the Court should decline to approve this Consent Agreement in the
26   exact form presented, the Parties shall use their best efforts to work together to modify the Consent
27   Agreement within 30 days so that it is acceptable to the Parties and the Court. If the Parties are unable

28

16
[PROPOSED] CONSENT AGREEMENT AND ORDER - CASE NO.: 1:06-CV-00023-REC-LJO

1  to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall be

2  immediately null and void.

3      40.     The settling Parties hereto enter into this Consent Agreement and submit it to the Court

4  for its approval and entry as a final judgment.

5  Dated: April ⁀5 , 2006                           California Sportfishing Protection Alliance

6

7                                                   By: _____

8                                                       Bill Jennings
                                                        Executive Director

9

Dated: April ___ , 2006                            Meridian Gold Company; Inc.

10

11

12                                                 By:_____
                                                       Edgar A. Smith
13                                                     Vice President Operations

14  APPROVED AS TO FORM:

15  Dated: April ___ , 2006                          GOLDSTEIN, DEMCHAK, BALLER, BORGEN
                                                      & DARDARIAN
16

17                                                 By:_____
                                                       Linda M. Dardarian
18                                                 Attorneys for California Sportfishing Protection
                                                   Alliance
19

20  Dated: April 4 , 2006                            LAW OFFICES OF MICHAEL R. LOZEAU

21

22                                                 By:_____
                                                       Michael R. Lozeau
23                                                 Attorneys for California Sportfishing Protection
                                                   Alliance
24

25  Dated: April ___ , 2006                          FARELLA, BRAUN & MARTEL LLP

26

27                                                 By:_____
                                                       Paul P. "Skip" Spaulding, III
28                                                     David J. Lazerwitz
                                                   Attorneys for Meridian Gold Company, Inc.

                                        17
        [PROPOSED] CONSENT AGREEMENT AND ORDER - CASE NO.: 1:06-CV-00023-REC-LJO

1    to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall be

2    immediately null and void.

3        40.    The settling Parties hereto enter into this Consent Agreement and submit it to the Court

4    for its approval and entry as a final judgment.

5    Dated: April ___, 2006                     California Sportfishing Protection Alliance

6

7                                               By:_____

8                                                   Bill Jennings
                                                   Executive Director

9
     Dated: April 11, 2006                      Meridian Gold Company, Inc.
10

11                                              By:_____

12                                                  Edgar A. Smith
                                                   Vice President Operations
13

14   APPROVED AS TO FORM:

15   Dated: April ___, 2006                     GOLDSTEIN, DEMCHAK, BALLER, BORGEN
                                                & DARDARIAN
16

17   _____                    By:_____

18                                                  Linda M. Dardarian
                                                   Attorneys for California Sportfishing Protection
19                                                 Alliance

20   Dated: April ___, 2006                     LAW OFFICES OF MICHAEL R. LOZEAU

21

22                                              By:_____
                                                   Michael R. Lozeau
23                                                 Attorneys for California Sportfishing Protection
                                                   Alliance
24

25   Dated: April 11, 2006                      FARELLA, BRAUN & MARTEL LLP

26
                                                By:_____
27                                                 Paul P. "Skip" Spaulding, III
                                                   David J. Lazerwitz
28                                                 Attorneys for Meridian Gold Company, Inc.

                                  17

1    to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall be

2    immediately null and void.

3         40.     The settling Parties hereto enter into this Consent Agreement and submit it to the Court

4    for its approval and entry as a final judgment.

5    Dated: April ___, 2006                      California Sportfishing Protection Alliance

6

7                                   By:_____

8                                       Bill Jennings
                                      Executive Director

9    Dated: April 11, 2006                      Meridian Gold Company, Inc.

10

11                                   By:_____

12                                       Edgar A. Smith
                                      Vice President Operations

13

14    APPROVED AS TO FORM:

15    Dated: April ___, 2006                      GOLDSTEIN, DEMCHAK, BALLER, BORGEN
                                      & DARDARIAN

16

17                                   By:_____
                                      Linda M. Dardarian

18                                   Attorneys for California Sportfishing Protection
                                    Alliance

19

20    Dated: April ___, 2006                      LAW OFFICES OF MICHAEL R. LOZEAU

21

22                                   By:_____
                                      Michael R. Lozeau

23                                   Attorneys for California Sportfishing Protection
                                    Alliance

24

25    Dated: April ___, 2006                      FARELLA, BRAUN & MARTEL LLP

26

27                                   By:_____
                                      Paul P. "Skip" Spaulding, III

28                                   David J. Lazerwitz
                                  Attorneys for Meridian Gold Company, Inc.

1  to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall be

2  immediately null and void.

3      40.     The settling Parties hereto enter into this Consent Agreement and submit it to the Court

4  for its approval and entry as a final judgment.

5  Dated: April ___ , 2006                          California Sportfishing Protection Alliance

6

7                                                   By:_____

8                                                       Bill Jennings
                                                         Executive Director

9
   Dated: April ___ , 2006                          Meridian Gold Company, Inc.
10

11
                                                    By:_____
12                                                      Edgar A. Smith
                                                         Vice President Operations
13

14  APPROVED AS TO FORM:

15  Dated: April _11_ , 2006                         GOLDSTEIN, DEMCHAK, BALLER, BORGEN
                                                     & DARDARIAN
16

17                                                  By: _Linda M. Dardarian_

18                                                      Linda M. Dardarian
                                                        Attorneys for California Sportfishing Protection
19                                                      Alliance

20  Dated: April ___ , 2006                          LAW OFFICES OF MICHAEL R. LOZEAU

21

22                                                  By:_____
                                                        Michael R. Lozeau
23                                                      Attorneys for California Sportfishing Protection
                                                        Alliance
24
   Dated: April ___ , 2006                          FARELLA, BRAUN & MARTEL LLP
25

26
                                                    By:_____
27                                                      Paul P. "Skip" Spaulding, III
                                                        David J. Lazerwitz
28                                                      Attorneys for Meridian Gold Company, Inc.

# Exhibit

# A



**LEGEND**

| | IDENTIFIED WASTE MANAGEMENT UNITS |
| | PIT LAKE AREA |
| - - - - - - - - | LIMIT OF PIT EXCAVATION |
| | OVERBURDEN DISPOSAL SITES (GROUP C WMU'S) |
| · · · · | ACCESS ROADS |

SCALE

0    2,000    4,000 FEET

**SITE PLAN SHOWING**
**KEY MINING FACILITIES**

MERIDIAN GOLD COMPANY
ROYAL MOUNTAIN KING MINE

**TRC**          **EXHIBIT A**

# Exhibit

## B

**EXHIBIT B**

Michael R. Lozeau
Law Office of Michael R. Lozeau
67 Juanita Way
San Francisco, California 94127
415-462-1964 / 415-462-6385 (fax)
mrlozeau@lozeaulaw.com

VIA REGISTERED MAIL –
RETURN RECEIPTS REQUESTED

June 1, 2005

Brian J. Kennedy
President, CEO, Vice-Chairman
Meridian Gold Inc.
9670 Gateway Drive, Suite 200
Reno, Nevada  89521

Donald Beckwith, Vice-President of Operations
Peter Dwelley, Director of Regulatory Affairs
John Teagle
Meridian Gold Company
P.O. Box 190
4461 Rock Creek Road
Copperopolis, California 95228

> **Re:** **Notice of Intent to Sue for Violations of the Federal Water Pollution Control Act (Clean Water Act), the California Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65), and the Resource Conservation and Recovery Act**

Dear Gentlemen,

We write to notify you that California Sportfishing Protection Alliance and Watershed Enforcers (hereinafter collectively referred to as "CSPA") believe that Meridian Gold Company's (hereinafter "Meridian Gold") Royal Mountain King Mine near Copperopolis, California is discharging pollutants into the waters of the United States in violation of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (hereinafter "CWA" or "Clean Water Act"). We also write to notify you that CSPA believes that Meridian Gold's Royal Mountain King Mine is discharging listed chemicals into designated drinking water supplies in violation of California's Safe Drinking Water and Toxic Enforcement Act of 1986, also known as "Proposition 65," California Health & Safety Code § 25249.5. In addition, we write to notify you that CSPA believes that Royal Mountain King Mine is handling, storing, and disposing of solid or hazardous wastes in a matter that may present an imminent and substantial

Meridian Gold Inc.
June 1, 2005
Page 2 of 36

endangerment to health or the environment in violation of the Resource Conservation and
Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq.

Specifically, and as described in more detail below, Meridian Gold is violating the CWA
by discharging pollutants from two overburden disposal piles and at least one wastewater
impoundment, including arsenic, manganese, nitrate, selenium, sulfate, nickel, and total
dissolved solids, into the waters of the United States without having either applied for or
obtained the requisite National Pollutant Discharge Elimination System ("NPDES") permit.

Meridian Gold also is violating the CWA by discharging storm water from the Royal
Mountain King Mine without a valid NPDES permit or, alternatively, in violation of NPDES
General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No.
92-12-DWQ, as amended by Order No. 97-03-DWQ ("Industrial Storm Water Permit" or
"Permit").

Meridian Gold also is violating or threatening to violate Proposition 65 by discharging
arsenic and nickel, chemicals known to cause cancer or reproductive toxicity, from the Royal
Mountain King Mine into groundwater that passes or probably will pass into waters that are
designated for drinking.

Meridian Gold also is violating RCRA by handling, storing, or disposing of solid or
hazardous waste such as arsenic, manganese, nitrate, selenium, sulfate, nickel, and total
dissolved solids, at the Royal Mountain King Mine in a manner that may present an imminent
and substantial endangerment to health or the environment.

By this letter, pursuant to 33 U.S.C. § 1365(a) and (b) of the CWA, Cal. Health & Safety
Code § 25249.7(d)(1), and 42 U.S.C. § 6972(b)(2)(A) of the RCRA, CSPA is providing
Meridian Gold with notice of CSPA's intent to file suit to address the violations of the Clean
Water Act, Safe Drinking Water and Toxic Enforcement Act, and Resource Conservation and
Recovery Act, as referenced in this letter.

## I.    BACKGROUND

The Royal Mountain King Mine's operations cover approximately 197 acres of land
approximately five miles from Copperopolis, California. Meridian Gold and/or its predecessors
in interest conducted gold mining, including heap leach mining, at the site from 1988 to July
1994. During active mining, approximately 56 million tons of ore and overburden were removed
from the three mining pits at the site. At least seven waste management units remain at the site.
These include a former mining pit now filled with a combination of wastewater, groundwater
and stormwater known as Skyrocket Pit Lake and several overburden disposal sites, including
Gold Knoll ODS and the Western ODS, both of which consist of discarded waste rock disposed
in previous active mining pits. The other four waste management units include one other ODS –
the Flotation Tailings Reservoir ODS – as well as the Process Water Pond, the Leachate
Concentrates Residue Facility, and the Flotation Tailings Reservoir Leachate Collection and
Removal System.

Meridian Gold Inc.
June 1, 2005
Page 3 of 36

Two creeks flow through the mining site – Little Johns Creek drains the eastern and central portions of the site, and Clover Creek drains the western side of the mining area. Both creeks are tributaries to Flowers Reservoir. Little Johns Creek continues below the Flowers Reservoir dam and flows into French Camp Slough, itself a tributary of the San Joaquin River and the Sacramento-San Joaquin River Delta ("Delta").

The Regional Board has established water quality standards for the San Joaquin River, the Delta and their tributaries in the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." The Basin Plan establishes a dissolved oxygen standard of 6.0 mg/L for the San Joaquin River in and around Stockton. The Basin Plan establishes a standard for electrical conductivity in the Delta and its tributaries of 0.7 mmhos/cm from April 1 through August 31 and 1.0 mmhos/cm from September 1 through March 31. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)." *Id.*, p. III-3.0. EPA has established recommended secondary MCL ranges for total dissolved solids (500 mg/L), specific conductance (900 μmho/cm), chloride (250 mg/L) and sulfate (250 mg/L). EPA also has established a maximum contaminant level for Nitrate + Nitrite of 10 mg/L.

The California Office of Environmental Health Hazard Assessments ("OEHHA") has established a California Public Health Goal for arsenic of 0.004 ug/L. Pursuant to Proposition 65, OEHHA has established a no significant risk level for arsenic of 5 ug/L and a maximum allowable dose level for reproductive toxicity for arsenic of 0.10 ug/day, which is equivalent to a concentration of 0.05 μg/L. EPA also has established a primary maximum contaminant level of 10 ug/L arsenic and a recommended criterion for ambient waters of 0.018 ug/L.

The Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmark has been established for pollutants discharged by Meridian Gold at the Royal Mountain King Mine: nitrate+nitrite – 0.68 mg/L as N. The State Board recently proposed to include a benchmark level for specific conductance of 200 μmho/cm.

## II.   PROPOSITION 65 PROHIBITS THE DISCHARGE OF LISTED CHEMICALS TO WATERS DESIGNATED FOR USE AS DRINKING WATER SUPPLIES.

The California Safe Drinking Water and Toxic Enforcement Act of 1986, commonly referred to as Proposition 65 after the ballot measure that enacted it, prohibits businesses from knowingly discharging or releasing listed chemicals into water or onto land where it passes or probably will pass into a source of drinking water. Cal. Health & Safety Code § 25249.5. The

Meridian Gold Inc.
June 1, 2005
Page 4 of 36

Governor of California, through the Office of Environmental Health Hazard Assessment, maintains the list of chemicals that are known to the State of California to cause cancer, birth defects or other reproductive harms. Cal. Health & Safety Code § 25249.8. On February 27, 1987, arsenic was included on the Proposition 65 list. On May 7, 2004, nickel was included on the Proposition 65 list.

Proposition 65's discharge prohibition does not apply to any discharge or release that meets both of the following criteria: (1) The discharge or release will not cause any significant amount of the discharged or released chemical to enter any source of drinking water, and (2) the discharge or release is in conformity with all other laws and with every applicable regulation, permit, requirement, and order. Cal. Health & Safety Code § 25249.9(b). The burden of showing that a specific discharge or release meets both of these criteria falls on the defendant. *Id.* The discharge prohibition also only applies to a particular listed chemical after 20 months have passed from the date of listing. Cal. Health & Safety Code § 25249.9(a)).

"'Source of drinking water' means either a present source of drinking water or water which is identified or designated in a water quality control plan adopted by a regional board as being suitable for domestic or municipal uses." Cal. Health & Safety Code § 25249.11(d). The State Board enacted Resolution No. 88-63 identifying all groundwaters of the State as water supplies. In the vicinity of Royal Mountain King Mine, groundwater and surface water at the mine site flow downgradient to groundwaters or Flowers Reservoir which are used for domestic water supplies. In addition, the Regional Board's Basin Plan identifies existing and designated beneficial uses for waters within the region. In the vicinity of the Royal Mountain King Mine, the Regional Board has identified the beneficial uses of Flowers Reservoir, Little Johns Creek, Clover Creek and French Camp Slough, as well as the San Joaquin River into which they flow, as including municipal and domestic drinking water supplies. *See* State Board Order No. 2004-007, at 3 (May 20, 2004).

The official summary of Proposition 65 required by OEHHA's regulations is attached hereto as Attachment A.

## III.   THE CLEAN WATER ACT REQUIRES NPDES PERMITS FOR DISCHARGES OF POLLUTANTS FROM POINT SOURCES ASSOCIATED WITH MINING ACTIVITIES INTO NAVIGABLE WATERS.

Under the CWA, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.21(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among

Meridian Gold Inc.
June 1, 2005
Page 5 of 36

other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

## IV.   UNDER THE CLEAN WATER ACT, NPDES PERMITS FOR DISCHARGES OF STORM WATER ASSOCIATED WITH INDUSTRIAL ACTIVITIES DO NOT APPLY TO STORM WATER DISCHARGES COMMINGLED WITH NON-STORMWATER DISCHARGES

Section 402(p) of the Clean Water Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES discharge permit (33 U.S.C. § 1342) such as the Industrial Storm Water Permit. The Act's storm water permitting requirements apply to active and inactive mineral mining and processing operations. However, the Industrial Storm Water Permit cannot be applied to industrial storm water discharges that are commingled or mixed with non-storm water discharges, with the exception of certain "authorized non-storm water discharges" listed in the Industrial Storm Water Permit. "Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit." Permit, Discharge Prohibition A(1). *See also id.*, Permit, Fact Sheet, p. 9 ("Unauthorized non-storm water discharges (even when commingled with storm water) shall be eliminated or covered by a separate NPDES Permit"). Where a mining facility's storm water discharges come into contact with contaminated springs and seeps or other mine drainage, those discharges cannot be governed by the Industrial Storm Water Permit. *See* Permit, Special Conditions D.

Where the Industrial Storm Water Permit applies, it sets forth a series of pollution control requirements. Discharge Prohibition A(1) of the Industrial Storm Water Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedence of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan.

The Permit sets forth detailed monitoring requirements. Permit, Section B(5)(a) – the Monitoring and Reporting Requirements – provides that "[a]ll storm water discharge locations shall be sampled." Section B(7) states that "Facility operators shall visually observe and collect samples of storm water discharges from all drainage areas that represent the quality and quantity of the facility's storm water discharges from the storm event." Section B(5)(a) of the Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm

Meridian Gold Inc.
June 1, 2005
Page 6 of 36

event in the wet season. All storm water discharge locations shall be sampled." Section
B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH,
specific conductance, and total organic carbon. Oil and grease may be substituted for total
organic carbon. Section B(5)(c)(ii) requires that "samples shall be analyzed for . . . [t]oxic
chemicals and other pollutants that are likely to be present in storm water discharges in
significant quantities."

Effluent Limitation B(3) of the Industrial Storm Water Permit requires dischargers to
reduce or prevent pollutants in their storm water discharges through implementation of best
available technology economically achievable ("BAT") for toxic and nonconventional pollutants
and best conventional pollutant control technology ("BCT") for conventional pollutants. BAT
and BCT include both nonstructural and structural measures. Section A(8).

Section A(1) and Provision E(2) of the Industrial Storm Water Permit require dischargers
of storm water associated with industrial activity to develop, implement, and update an adequate
storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1)
and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue
following their existing SWPPP and implement any necessary revisions to their SWPPP in a
timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants
associated with industrial activities that may affect the quality of storm and non-storm water
discharges from the facility and identify and implement site-specific best management practices
("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and
authorized non-storm water discharges (Section A(2)). The SWPPP must also include BMPs
that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description
of individuals and their responsibilities for developing and implementing the SWPPP (Section
A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern
and nearby waterbodies, the location of the storm water collection, conveyance and discharge
system, structural control measures, impervious areas, areas of actual and potential pollutant
contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and
stored at the site (Section A(5)); a description of potential pollutant sources including industrial
processes, material handling and storage areas, dust and particulate generating activities, and a
description of significant spills and leaks, a list of all non-storm water discharges and their
sources, and a description of locations where soil erosion may occur (Section A(6)). The
SWPPP must include an assessment of potential pollutant sources at the Facility and a
description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants
in storm water discharges and authorized non-storm water discharges, including structural BMPs
where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated
to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to
the Regional Board describing changes it will make to its current BMPs in order to prevent or
reduce any pollutant in its storm water discharges that is causing or contributing to an
exceedance of water quality standards. Once approved by the Regional Board, the additional

Meridian Gold Inc.
June 1, 2005
Page 7 of 36

BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

Finally, Section B(14) of the Industrial Storm Water Permit require dischargers to submit an Annual Report by July 1 of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. Sections B(14), C(9), (10). Section A(9)(d) of the Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the Industrial Storm Water Permit. *See also* Sections C(9) and (10) and B(14).

## V. THE RESOURCE CONSERVATION AND RECOVERY ACT PROHIBITS THE HANDLING, STORAGE, OR DISPOSAL OF ANY SOLID OR HAZARDOUS WASTE IN A MANNER THAT MAY PRESENT AN IMMINENT AND SUBSTANTIAL THREAT TO HEALTH OR THE ENVIRONMENT.

RCRA prohibits the owner or operator of a treatment, storage, or disposal facility from contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B). RCRA establishes liability even where the wastes at issue consist solely of solid wastes which are not hazardous, *see, e.g., Zands v. Nelson*, 779 F. Supp. 1254 (S.D. Cal. 1991), as long as the wastes may present an imminent and substantial endangerment to health or the environment.

Courts have noted that the "imminent and substantial endangerment" standard "is expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2d Cir. 1991) (internal quotation marks omitted), *rev'd in part on other grounds*, 112 S. Ct. 2638 (1992). There is no requirement to show actual harm, only threatened harm, and the term "imminence" does not require a showing that harm will occur immediately, so long as the risk of threatened harm is present. *Id*; *see also Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429, * 12-13 (E.D. Cal. 1993).

## VI. MERIDIAN GOLD IS DISCHARGING NUMEROUS POLLUTANTS FROM WASTE MANAGEMENT UNITS AT ROYAL MOUNTAIN KING MINE.

CSPA is informed and believes, and thereupon alleges, that Meridian Gold is discharging pollutants and/or chemicals listed pursuant to Proposition 65 from all seven waste management units at the Royal Mountain King Mine to surface waters and/or ground waters on, adjacent to or beneath the mining site:

Meridian Gold Inc.
June 1, 2005
Page 8 of 36

### A.   Discharges from Skyrocket Pit Lake.

According to the available information, Skyrocket Pit Lake is discharging to both groundwater and surface waters.  CSPA is informed and believes, and thereupon alleges, that Skyrocket Pit Lake is discharging, among other pollutants, nitrate, selenium, sulfate, bicarbonate and total dissolved solids to Little Johns Creek.  CSPA is informed and believes, and thereupon alleges, that Skyrocket Pit Lake is discharging, among other pollutants, arsenic, nickel, and sulfate to groundwater flowing beneath the mining site.

### B.   Discharges from Gold Knoll ODS.

According to the available information, the Gold Knoll ODS is discharging to both groundwater and surface waters.  CSPA is informed and believes, and thereupon alleges, that the Gold Knoll ODS is discharging, among other pollutants, manganese, nitrate, selenium, sulfate and total dissolved solids to Clover Creek.  CSPA is informed and believes, and thereupon alleges, that the Gold Knoll ODS is discharging, among other pollutants, arsenic, nickel, nitrate, sulfate, and total dissolved solids to groundwater flowing beneath the mining site.

### C.   Discharges from Western ODS.

According to the available information, the Western ODS is discharging to both groundwater and surface waters.  CSPA is informed and believes, and thereupon alleges, that the Western ODS is discharging, among other pollutants, manganese, nitrate, selenium, sulfate and total dissolved solids to Clover Creek.  CSPA is informed and believes, and thereupon alleges, that the Western ODS is discharging nitrate, selenium and sulfate to Little Johns Creek.  CSPA is informed and believes, and thereupon alleges, that the Western ODS is discharging arsenic and nickel to groundwater flowing beneath the mining site.

### D.   Discharges from Flotation Tailings Reservoir ODS.

According to the available information, the Flotation Tailings Reservoir ODS is discharging pollutants to groundwater flowing beneath the mining site.  CSPA is informed and believes, and thereupon alleges, that the Flotation Tailings Reservoir ODS is discharging, among other pollutants, selenium, sulfate, TDS and nitrate to groundwater flowing beneath the mining site.

### E.   Discharges from the Flotation Tailings Reservoir.

According to the available information, the Flotation Tailings Reservoir is discharging pollutants to groundwater flowing beneath the mining site.  CSPA is informed and believes, and thereupon alleges, that the Flotation Tailings Reservoir is discharging, among other pollutants, sulfate, TDS and nitrate to groundwater flowing beneath the mining site.

### F.    Discharges from the Process Water Pond.

According to the available information, the Process Water Pond is discharging pollutants to groundwater flowing beneath the mining site. CSPA is informed and believes, and thereupon alleges, that the Process Water Pond is discharging, among other pollutants, sulfate, TDS and nitrate to groundwater flowing beneath the mining site.

### G.    Discharges from Leachate Concentrate Residue Facility.

According to the available information, the Leachate Concentrate Residue Facility is discharging pollutants to groundwater flowing beneath the mining site. CSPA is informed and believes, and thereupon alleges, that the Leachate Concentrate Residue Facility is discharging, among other pollutants, sulfate, TDS, nitrate, cyanide to groundwater flowing beneath the mining site.

Meridian Gold's discharges of the significant array of pollutants described above to groundwater and surface waters have had and continue to have deleterious impacts on the quality of those waters and their beneficial uses. High levels of arsenic and total dissolved solids attributable to discharges from Royal Mountain King Mine, as well as other pollutants, are consistently observed in Flowers Reservoir and downgradient drinking water wells.

## VII.    MERIDIAN GOLD'S DISCHARGES OF LISTED CHEMICALS TO DRINKING WATER ARE VIOLATING OR THREATENING TO VIOLATE PROPOSITION 65.

Meridian Gold is discharging contaminants listed pursuant to Proposition 65 to sources of drinking water beneath and downgradient from the Royal Mountain King Mine in violation of Health & Safety Code § 25249.5. Meridian Gold is knowingly discharging arsenic and nickel from the Western ODS, the Gold Knoll ODS and Skyrocket Pit Lake to ground water flowing through the site. Groundwater beneath the mine site flows downgradient to areas where domestic wells are located, to Little Johns and Clover Creeks and to the Flowers Reservoir, all of which the Regional Board or State Board has designated for drinking water use. Because Meridian Gold is violating the CWA as well as the Porter-Cologne Water Quality Control Act, Water Code § 13000 *et seq.*, at the site, as described in the section above, discharges of listed chemicals from the site are strictly prohibited. In addition, Meridian Gold is discharging arsenic into groundwater at levels well in excess of the significant risk level of 5 ug/day and the maximum allowable dose level for reproductive toxicity of 0.05 ug/L identified by OEHHA. Furthermore, Meridian Gold's current discharges of nickel constitute a threat to violate Health and Safety Code § 25249.5 when its provisions regarding nickel discharges become effective on January 7, 2006 (20 months subsequent to the date nickel was included on the Proposition 65 list).

For these reasons, Meridian Gold is in violation of Proposition 65, for knowingly discharging or threatening to discharge arsenic and nickel into waters designated for drinking water. CSPA is informed and believes that the arsenic violations have been ongoing on a daily

basis at least June 1, 2004, and will continue to occur. Each discharge of arsenic as described above constitutes a separate violation of Proposition 65. Consistent with the one-year statute of limitations applicable to Proposition 65 enforcement actions, Meridian Gold is subject to penalties for violations of Proposition 65 since June 1, 2004.

## VIII. MERIDIAN GOLD'S DISCHARGES OF POLLUTANTS FROM POINT SOURCES INTO NAVIGABLE WATERS WITHOUT AN NPDES PERMIT ARE VIOLATING THE CWA.

Meridian Gold is discharging the pollutants described in Section VI, above, from point sources into waters of the United States without the NPDES permit required by the CWA.

The CWA defines "point source" as "[a]ny discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). *Sierra Club v. Abston Construction Co.*, 620 F2d 41 (5th Cir. 1980); *United States v. Earth Sciences, Inc*, 599 F.2d 368 (10th Cir. 1979). Each of the seven waste management units at the Royal Mountain King Mine are point sources. Three of the units – Skyrocket Pit Lake, Western ODS and Gold Knoll ODS are "discernable, confined and discrete conveyance[s]" that are discharging pollutants to waters of the United States. The other four units are point sources that may be discharging pollutants to waters of the United States. In addition, each of those point sources conveys pollutants to waters of the United States via seeps, sumps, drainage ditches, channels and other discrete conveyances which also are point sources under the CWA.

"Pollutant" means: Dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). *Northern Plains Resource Council v. Fidelity Exploration and Development Co.*, 325 F.3d 1155 (9th Cir. 2003). Pollutants governed by the CWA include manganese, nitrate, selenium, sulfate, total dissolved solids, arsenic, nickel and other constituents released from Meridian Gold's waste management units.

"Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source . . ." *South Florida Water Management Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004). "The term 'navigable waters' means the waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States include all tributaries to navigable waters. *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001). Waters of the United States also include ephemeral creeks. Clover Creek, Little Johns Creek, and Flower Reservoir are therefore waters of the United States. Meridian Gold is adding pollutants to Clover Creek, Little Johns Creek and Flower Reservoir from Skyrocket Pit Lake, Gold Knoll ODS and Western ODS.

Meridian Gold does not have an NPDES permit that governs discharges from Skyrocket Pit Lake, Western ODS or Gold Knoll ODS. On July 30, 1999, Meridian Gold submitted an

Meridian Gold Inc.
June 1, 2005
Page 11 of 36

application to the Regional Board to obtain an NPDES permit. On March 13, 2003, Meridian Gold withdrew its NPDES permit application. At this time, Meridian Gold has not applied for an NPDES permit for any of the discharges associated with the Royal Mountain King Mine described in the paragraphs above.

For these reasons, Meridian Gold is in violation of the CWA's duty for persons to apply for an NPDES permit. 40 C.F.R. § 122.21(a). CSPA is informed and believes that this violation has been ongoing on a daily basis since June 1, 2000, and will continue to occur. Each day on which Meridian Gold failed to apply for an NPDES permit for these discharges constitutes a separate violation of the Act, subjecting Meridian Gold to daily penalties since June 1, 2005. Likewise, Meridian Gold is in violation of Section 1311(a) of the CWA, for discharging pollutants from point sources without first obtaining the requisite NPDES permit. CSPA is informed and believes that this violation has been ongoing on a daily basis since June 1, 2000 and will continue to occur. Each day on which Meridian Gold failed to obtain an NPDES permit for these discharges constitutes a separate violation of the Act, subjecting Meridian Gold to daily penalties since June 1, 2005.

## IX.    MERIDIAN GOLD IS DISCHARGING STORM WATER ASSOCIATED WITH ITS MINING ACTIVITIES AT ROYAL MOUNTAIN KING MINE THAT IS NOT COVERED BY THE INDUSTRIAL STORM WATER PERMIT, THEREBY VIOLATING THE CWA OR, ALTERNATIVELY, THAT PERMIT.

On March 20, 1992, Meridian Gold submitted a notice of intent to comply with the terms of the Industrial Storm Water Permit for certain portions of the Royal Mountain King Mine. On June 6, 1997, the company prepared an updated notice of intent. According to the company, Meridian Gold discharge storm water associated with the mine from five locations at the site. Sampling locations purportedly correlating to those five storm water discharge locations, purportedly monitored at six monitoring locations identified as SWM-02, SWM-08, SWM-09, SWM-10, TSWM-1 and TSWM-2.

### A.    Discharges of Storm Water Without An NPDES Permit

Despite those notices of intent, Meridian Gold's storm water discharges at the Royal Mountain King Mine are not eligible for coverage under the Industrial Storm Water Permit. Storm water associated with the waste management units is commingled with unauthorized non-storm water discharges occurring at the mine site, including contaminated seeps and recycled leachate. Because storm water associated with the Royal Mountain King Mine is not exclusively storm water, but also includes wastewater and non-storm water discharges, the Industrial Storm Water Permit does not apply to any discharges at the mine site. For example, CSPA is informed and believes, and thereupon alleges, that storm water falling on the Western ODS commingles with leachate sprayed on the top of the ODS as well as with leachate seeping from the base of the ODS prior to discharging to Clover Creek. Because it commingles with those non-storm water discharges, the storm water from the Western ODS is ineligible for coverage by the Industrial Storm Water Permit. The same is true for other waste management units at the site. Storm water from the Gold Knolls ODS and other waste management units also commingles with

Meridian Gold Inc.
June 1, 2005
Page 12 of 36

contaminated leachate seeps, making those storm water flows ineligible for coverage under the Industrial Storm Water Permit. Accordingly, Meridian Gold is discharging storm water associated with industrial activity at the Royal Mountain King Mine without an NPDES permit in violation of Sections 301 and 402(p) of the CWA, 33 U.S.C. §§ 1311, 1342(p). CSPA is informed and believes these violations have been ongoing on a daily basis since the date five years prior to the date of this letter and will continue to occur.

## B.   Alternatively, Discharges in Violation of the Industrial Storm Water Permit.

Assuming the Industrial Storm Water Permit applies to some storm water discharges at Royal Mountain King Mine, Meridian Gold is in violation of the Permit.

CSPA believes that Meridian Gold has discharged and continues to discharge high electrical conductivity, total dissolved solids, sulfate, arsenic, selenium, and nitrate+nitrite in violation of the Industrial Storm Water Permit as evidenced by high levels of these pollutants discharged from the Facility during significant rain events. Meridian Gold's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than stormwater and specific pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the Industrial Storm Water Permit. Specific monitoring results establishing violations of these provisions include the following:

### 1.   Discharges of Effluent With High Specific Conductance.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high specific conductance on the dates and at the concentrations listed in Appendix A have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the Industrial Storm Water Permit.

The violations listed in Appendix A include both storm water discharges as well as unauthorized non-storm water discharges. CSPA alleges that such violations have occurred or will occur every day since June 1, 2000, and will continue to occur at the Facility subsequent to the date of this notice of intent to sue. Each discharge of high specific conductance from the Facility constitutes a separate violation of the Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

### 2.   Discharges of Effluent With High Total Dissolved Solids.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high total dissolved solids on the dates and at the concentrations listed in Appendix B have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the Industrial Storm Water Permit.

Meridian Gold Inc.
June 1, 2005
Page 13 of 36

The violations listed in Appendix B include both storm water discharges as well as unauthorized non-storm water discharges. CSPA alleges that such violations have occurred or will occur every day since June 1, 2000, and will continue to occur at the Facility subsequent to the date of this notice of intent to sue. Each discharge of high total dissolved solids from the Facility constitutes a separate violation of the Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

### 3. Discharges of Effluent With High Sulfate Levels.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high levels of sulfate on the dates and at the concentrations listed in Appendix C have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the Industrial Storm Water Permit.

The violations listed in Appendix C include both storm water discharges as well as unauthorized non-storm water discharges. CSPA alleges that such violations have occurred or will occur every day since June 1, 2000, and will continue to occur at the Facility subsequent to the date of this notice of intent to sue. Each discharge of high levels of sulfate from the Facility constitutes a separate violation of the Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

### 4. Discharges of Effluent With High Levels of Arsenic.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high levels of arsenic on the dates and at the concentrations listed in Appendix D have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the Industrial Storm Water Permit.

The violations listed in Appendix D include both storm water discharges as well as unauthorized non-storm water discharges. CSPA alleges that such violations have occurred or will occur every day since June 1, 2000, and will continue to occur at the Facility subsequent to the date of this notice of intent to sue. Each discharge of high levels of arsenic from the Facility constitutes a separate violation of the Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

### 5. Discharges of Effluent With High Levels of Selenium.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high levels of selenium on the dates and at the concentrations listed in Appendix E have violated

Meridian Gold Inc.
June 1, 2005
Page 14 of 36

Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the
Industrial Storm Water Permit.

The violations listed in Appendix E include both storm water discharges as well as
unauthorized non-storm water discharges. CSPA alleges that such violations have occurred or
will occur every day since June 1, 2000, and will continue to occur at the Facility subsequent to
the date of this notice of intent to sue. Each discharge of high levels of selenium from the
Facility constitutes a separate violation of the Industrial Storm Water Permit and the Act.
Consistent with the five-year statute of limitations applicable to citizen enforcement actions
brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for
violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

## 6.    Discharges of High Levels of Nitrate + Nitrite.

CSPA alleges that discharges from the Royal Mountain King Mine of effluent with high
levels of nitrate+nitrite on the dates and at the concentrations listed in Appendix F have violated
Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the
Industrial Storm Water Permit.

The violations listed in Appendix F include both storm water discharges as well as
unauthorized non-storm water discharges. CSPA further alleges that such violations also have
occurred or will occur on other rain dates, including during every single significant rain event
that has occurred since June 1, 2000, and that will occur at the Facility subsequent to the date of
this notice of intent to sue. These unlawful discharges of nitrate+nitrite from the Facility are
ongoing. Each discharge of excessive nitrate+nitrite from the Facility constitutes a separate
violation of the Industrial Storm Water Permit and the Act. Consistent with the five-year statute
of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean
Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water
Permit and the Act since June 1, 2000.

## 7.    Failure to Monitor Storm Water.

Again assuming the Industrial Storm Water Permit applies to storm water discharges at
Royal Mountain King Mine, Meridian Gold is violating Sections B(5)(a) and B(7) of the Permit
requiring, respectively, all storm water discharge locations to be sampled and representative of
the quality and quantity of the Mine's storm water discharges from each sampled storm event.
Likewise, Meridian Gold is violating Section B's timing requirements for taking samples.
Instead of complying with the Permit's monitoring requirements and developing a storm water
monitoring program, Meridian Gold opted to submit its preexisting monitoring program required
by WDR No. 5-01-040 to satisfy the requirements of the Industrial Storm Water Permit.[1]
Monitoring pursuant to WDR No. 5-01-040 samples water quality from leachate seeps, Little

---

[1]    The letter from Regional Board staff dated March 8, 1993 referenced by Meridian Gold
in several annual reports does not alter the monitoring requirements of the Industrial Storm
Water Permit.

Meridian Gold Inc.
June 1, 2005
Page 15 of 36

Johns Creek and Clover Creek. None of the samples analyze storm water in isolation. To date, Meridian Gold has no samples of the quality of storm water, for example, running off of the ODSs at the site unaffected by leachate.

Because Meridian Gold has not taken samples consisting entirely of storm water running off of the mine site, Meridian Gold has failed to obtain representative samples of storm water discharges from the mine site. Meridian Gold has not sampled all storm water discharges at the mine site. Nor is it clear that any of the samples taken pursuant to WDR No. 5-01-040 were taken during rain events consistent with the sampling requirements of the Industrial Storm Water Permit. Lastly, since at least the 2001-02 rainy season, Meridian Gold has failed to report analytical results in its annual reports for all of the pollutants likely to be discharged, including for example, arsenic, selenium and nitrate+nitrite.

The Facility's failure to comply with the Industrial Storm Water Permit's monitoring requirements are ongoing violations of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for these violations of the Industrial Storm Water Permit and the Act since June 1, 2000.

## 8.    Failure to Implement BAT/BCT.

CSPA's investigation indicates that Meridian Gold has not implemented BAT and BCT at the Facility for its discharges of high electrical conductivity, total dissolved solids, sulfate, arsenic, selenium, nitrate+nitrite, and other pollutants in violation of Effluent Limitation B(3) of the Industrial Storm Water Permit.

Meridian Gold was required to have implemented BAT/BCT by no later than October 1, 1992. Therefore, Meridian Gold has been in continuous violation of the BAT/BCT requirements every day since October 1, 1992, and will continue to be in violation every day that Meridian Gold fails to implement BAT/BCT. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Order and the Act occurring since June 1, 2000.

## 9.    Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

Meridian Gold Inc.
June 1, 2005
Page 16 of 36

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)) and include information specified by the Industrial Storm Water Permit. Permit, Sections A(3)-(10). *See supra.*

CSPA's investigation of the conditions at the Facility demonstrates that Meridian Gold has been operating with an inadequately developed or implemented SWPPP in violation of Sections A(1)-(10), B(3), and E(2) of the Permit. Meridian Gold has been in continuous violation of these sections of the Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Meridian Gold fails to develop and implement an effective SWPPP. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for daily violations of the Order and the Act occurring since June 1, 2000.

### 10.   Failure to Respond to Discharges Contributing to Exceedances of Water Quality Standards.

As indicated above, Meridian Gold is discharging high electrical conductivity, total dissolved solids, sulfate, arsenic, selenium, and nitrate+nitrite that are causing or contributing to exceedances of applicable water quality standards, including but not limited to the narrative standards for toxicity and biostimulatory pollutants and the numeric water quality standards for electrical conductance, sulphate, and selenium. For each of these pollutants, Meridian Gold was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards. Based on CSPA's review of available documents, Meridian Gold was aware of high levels of many of these pollutants prior to June 1, 2000. Likewise, Meridian Gold has not filed any reports describing its noncompliance with the Industrial Storm Water Permit in violation of Section C(11)(d). Lastly, CSPA is informed and believes, and thereupon alleges, that Meridian Gold's SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). Meridian Gold has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Industrial Storm Water Permit every day since June 1, 2000, and will continue to be in violation every day that Meridian Gold fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for violations of the Industrial Storm Water Permit and the Act occurring since June 1, 2000.

### 11.   Failure to File True and Correct Reports.

CSPA's investigation indicates that Meridian Gold has signed incomplete annual reports and purported to comply with the Industrial Storm Water Permit despite significant

Meridian Gold Inc.
June 1, 2005
Page 17 of 36

noncompliance at the Facility. Consequently, Meridian Gold has violated Sections A(9)(d),
B(14) and C(9) & (10) of the Industrial Storm Water Permit every time Meridian Gold signed an
incomplete or incorrect annual report that falsely certified compliance with the Act. Consistent
with the five-year statute of limitations applicable to citizen enforcement actions brought
pursuant to the federal Clean Water Act, Meridian Gold is subject to penalties for civil violations
of Section (C) of the Industrial Storm Water Permit and the Act occurring since June 1, 2000.

## X.   MERIDIAN GOLD IS CONTRIBUTING TO THE HANDLING, STORING, AND DISPOSAL OF SOLID OR HAZARDOUS WASTES THAT MAY PRESENT AN IMMINENT AND SUBSTANTIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT IN VIOLATION OF RCRA.

The foregoing description of Meridian Gold's discharges of pollutants into surface and
ground waters also establishes violations of the RCRA § 7002(a)(1)(B). 42 U.S.C. §
6972(a)(1)(B). Through its discharges of solid and/or hazardous wastes into ground water from
its waste management units, Meridian Gold is handling, storing or disposing of waste in a
manner that may present an imminent and substantial threat to health and/or the environment in
violation of the RCRA. *Id.* Furthermore, to the extent that Meridian Gold is discharging solid
and/or hazardous wastes into surface waters without violating the Clean Water Act's
requirements, it is violating the RCRA by handling, storing or disposing of waste in a manner
that may present an imminent and substantial threat to health and/or the environment. *See id.*;
*see also* 40 C.F.R. § 261.4(a)(2). CSPA is informed and believes that those violations have been
ongoing on a daily basis since June 1, 2000 and will continue to occur. Consistent with the five-
year statute of limitations applicable to citizen penalty enforcement actions under 28 U.S.C. §
2462, Meridian Gold is subject to penalties for violating RCRA on a daily basis since June 1,
2005.

## XI.   PERSONS RESPONSIBLE FOR VIOLATIONS.

CSPA puts Meridian Gold on notice that they are the persons responsible for the
violations described above. If additional persons are subsequently identified as also being
responsible for the violations set forth above, CSPA puts Meridian Gold on notice that it intends
to include those persons in this action.

## XII.   NAME AND ADDRESS OF NOTICING PARTY.

Our names, addresses and telephone numbers are as follows:

> Jim Crenshaw, President
> California Sportfishing Protection Alliance
> 1248 E. Oak Avenue, #d
> Woodland, CA 95776
> (530) 661-0997

Meridian Gold Inc.
June 1, 2005
Page 18 of 36

Richard Drury
Watershed Enforcers
651 Gateway Blvd., Suite 900
South San Francisco, CA 94080
(415) 589-1660 x. 20

## XIII. COUNSEL.

CSPA and Watershed Enforcers have retained legal counsel to represent them in this matter. Please direct all communications to:

Linda M. Dardarian
Nina Rabin
Goldstein, Demchak, Baller, Borgen & Dardarian
300 Lakeside Drive, Suite 1000
Oakland, California 94612
(510) 763-9800
(510) 835-1417 (fax)
ldar@gbdlegal.com
nrabin@gdblegal.com

Michael R. Lozeau
Law Office of Michael R. Lozeau
67 Juanita Way
San Francisco, CA 94127
(415) 462-1964
(415) 462-6385 (fax)
mrlozeau@lozeaulaw.com

## XIV. PENALTIES.

Pursuant to Section 309(d) of the Clean Water Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the CWA subjects Meridian Gold to a penalty of up to $27,500 per day per violation (violations from January 30, 1997 through March 15, 2004) and $32,500 per day per violation (violations after March 15, 2004) for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to Sue. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Act (33 U.S.C. § 1365(d)), which permits prevailing parties to recover costs and fees, including attorneys' fees, CSPA will seek its reasonable attorney's fees, expenses and costs associated with this matter.

Pursuant to California Health and Safety Code § 25249.7, each separate violation of Proposition 65 subjects Meridian Gold to a penalty of up to $2,500 per day for each violation in

Meridian Gold Inc.
June 1, 2005
Page 19 of 36

addition to any other penalty established by law for all violations occurring during the period commencing one year prior to the date of the Notice of Violations and Intent to Sue. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of Proposition 65 pursuant to Health and Safety Code § 25249.7(a). Lastly, pursuant to California Code of Civil Procedure § 1021.5, which permits prevailing parties in public interest cases to recover costs and fees, including attorneys' and expert fees, CSPA will seek its reasonable attorney's fees and costs associated with this matter.

Pursuant to Sections 7002(a) and 3008(g) of the RCRA (42 U.S.C. §§ 6972(a) and 6928(g)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of RCRA subjects Meridian Gold to a penalty of up to $27,500 per day per violation (violations from January 30, 1997 through March 15, 2004) and $32,500 per day per violation (violations after March 15, 2004) for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to Sue. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the RCRA pursuant to Section 7002(a) (42 U.S.C. § 6972(a)). Lastly, pursuant to Section 7002(e) of the RCRA (42 U.S.C. § 6972(e)), which permits prevailing parties to recover costs and fees, including attorneys' fees, CSPA will seek its reasonable attorneys' fees, expenses and costs associated with this matter.

CSPA believes this Notice of Violations and Intent to Sue sufficiently states grounds for filing suit. We intend, at the close of the 60-day notice period or thereafter, to file a citizen suit under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365, and Cal. Health and Safety Code § 25249.7 against Meridian Gold and its agents for the above-referenced violations. We further intend, at the close of the 90-day notice period or thereafter, to file a citizen suit under Section 7002(a)(1)(B) of the RCRA, 42 U.S.C. § 6972(a)(1)(B).

During the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. However, if you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court and/or state court if discussions are continuing when that period ends.

Sincerely,

Jim Crenshaw (WR)

Jim Crenshaw, President
California Sportfishing Protection Alliance

Richard Drury (WR)

Richard Drury
Watershed Enforcers

Meridian Gold Inc.
June 1, 2005
Page 20 of 36

## ATTACHMENT A

### OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT
### CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
### THE SAFE DRINKING WATER AND TOXIC ENFORCEMENT ACT OF 1986
### (PROPOSITION 65): A SUMMARY

The following summary has been prepared by the Office of Environmental Health Hazard Assessment, the lead agency for the implementation of the Safe Drinking Water and Toxic Enforcement Act of 1986 (commonly known as "Proposition 65"). A copy of this summary must be included as an attachment to any notice of violation served upon an alleged violator of the Act. The summary provides basic information about the provisions of the law, and is intended to serve only as a convenient source of general information. It is not intended to provide authoritative guidance on the meaning or application of the law. The reader is directed to the statute and its implementing regulations (see citations below) for further information.

Proposition 65 appears in California law as Health and Safety Code Sections 25249.5 through 25249.13. Regulations that provide more specific guidance on compliance, and that specify procedures to be followed by the State in carrying out certain aspects of the law, are found in Title 22 of the California Code of Regulations, Sections 12000 through 14000.

### WHAT DOES PROPOSITION 65 REQUIRE?

*The "Governor's List."* Proposition 65 requires the Governor to publish a list of chemicals that are known to the State of California to cause cancer, or birth defects or other reproductive harm. This list must be updated at least once a year. Over 735 chemical listings have been included as of November 16, 2001. Only those chemicals Revised April 2005 that are on the list are regulated under this law. Businesses that produce, use, release or otherwise engage in activities involving those chemicals must comply with the following:

*Clear and reasonable warnings.* A business is required to warn a person before "knowingly and intentionally" exposing that person to a listed chemical. The warning given must be "clear and reasonable." This means that the warning must: (1) clearly make known that the chemical involved is known to cause cancer, or birth defects or other reproductive harm; and (2) be given in such a way that it will effectively reach the person before he or she is exposed. Exposures are exempt from the warning requirement if they occur less than twelve months after the date of listing of the chemical.

*Prohibition from discharges into drinking water.* A business must not knowingly discharge or release a listed chemical into water or onto land where it passes or probably will pass into a source of drinking water. Discharges are exempt from this requirement if they occur less than twenty months after the date of listing of the chemical.

Meridian Gold Inc.
June 1, 2005
Page 21 of 36

*DOES PROPOSITION 65 PROVIDE ANY EXEMPTIONS?*

Yes. The law exempts:

*Governmental agencies and public water utilities.* All agencies of the federal, State or local government, as well as entities operating public water systems, are exempt.

*Businesses with nine or fewer employees.* Neither the warning requirement nor the discharge prohibition applies to a business that employs a total of nine or fewer employees.

*Exposures that pose no significant risk of cancer.* For chemicals that are listed as known to the State to cause cancer ("carcinogens"), a warning is not required if the business can demonstrate that the exposure occurs at a level that poses "no significant risk." This means that the exposure is calculated to result in not more than one excess case of cancer in 100,000 individuals exposed over a 70-year lifetime. The Proposition 65 regulations identify specific "no significant risk" levels for more than 250 listed carcinogens.

*Exposures that will produce no observable reproductive effect at 1,000 times the level in question.* For chemicals known to the State to cause birth defects or other reproductive harm ("reproductive toxicants"), a warning is not required if the business can demonstrate that the exposure will produce no observable effect, even at 1,000 times the level in question. In other words, the level of exposure must be below the "no observable effect level (NOEL)," divided by a 1,000-fold safety or uncertainty factor. The "no observable effect level" is the highest dose level which has not been associated with an observable adverse reproductive or developmental effect.

*Discharges that do not result in a "significant amount" of the listed chemical entering into any source of drinking water.* The prohibition from discharges into drinking water Revised April 2005 does not apply if the discharger is able to demonstrate that a "significant amount" of the listed chemical has not, does not, or will not enter any drinking water source, and that the discharge complies with all other applicable laws, regulations, permits, requirements, or orders. A "significant amount" means any detectable amount, except an amount that would meet the "no significant risk" or "no observable effect" test if an individual were exposed to such an amount in drinking water.

*HOW IS PROPOSITION 65 ENFORCED?*

Enforcement is carried out through civil lawsuits. These lawsuits may be brought by the Attorney General, any district attorney, or certain city attorneys (those in cities with a population exceeding 750,000). Lawsuits may also be brought by private parties acting in the public interest, but only after providing notice of the alleged violation to the Attorney General, the appropriate district attorney and city attorney, and the business accused of the violation. The notice must provide adequate information to allow the recipient to assess the nature of the alleged violation. A notice must comply with the information and procedural requirements specified in regulations (Title 22, California Code of Regulations, Section 12903). A private party may not pursue an

Meridian Gold Inc.
June 1, 2005
Page 22 of 36

enforcement action directly under Proposition 65 if one of the governmental officials noted
above initiates an action within sixty days of the notice.

A business found to be in violation of Proposition 65 is subject to civil penalties of up to
$2,500 per day for each violation. In addition, the business may be ordered by a court of law to
stop committing the violation.

*FOR FURTHER INFORMATION...*

Contact the Office of Environmental Health Hazard Assessment's Proposition 65
Implementation Office at (916) 445-6900.

Meridian Gold Inc.
June 1, 2005
Page 23 of 36

# APPENDIX A – Specific Conductance Violations

| Monitoring Location | Date | Specific Conductance (umhos/cm) | Water Quality Standard, Criterion, or Benchmark (umhos/cm) 200 (proposed benchmark); 700 (agricultural WQ criterion); and/or 900 (secondary MCL) |
|---|---|---|---|
| SWM-02 | 05/16/00 | 2770 | 200; 700; and/or 900 |
| SWM-02 | 01/15/01 | 3400 | 200; 700; and/or 900 |
| SWM-02 | 02/28/01 | 2600 | Same |
| SWM-02 | 03/23/01 | 3000 | Same |
| SWM-02 | 04/27/01 | 2400 | Same |
| SWM-02 | 11/29/01 | 6600 | Same |
| SWM-02 | 12/20/01 | 4000 | Same |
| SWM-02 | 01/28/02 | 3000 | Same |
| SWM-02 | 02/26/02 | 2400 | Same |
| SWM-02 | 03/25/02 | 2100 | Same |
| SWM-02 | 04/16/02 | 2800 | Same |
| SWM-02 | 05/28/02 | 5000 | Same |
| SWM-02 | 11/13/02 | 7800 | Same |
| SWM-02 | 12/05/02 | 7000 | Same |
| SWM-02 | 01/06/03 | 4200 | Same |
| SWM-02 | 02/11/03 | 5000 | Same |
| SWM-02 | 03/20/03 | 3800 | Same |
| SWM-02 | 04/08/03 | 4000 | Same |
| SWM-02 | 12/30/03 | 3400 | Same |
| SWM-02 | 01/13/04 | 4400 | Same |
| SWM-02 | 02/27/04 | 2200 | Same |
| SWM-08 | 05/16/00 | 3150 | Same |
| SWM-08 | 06/14/00 | 3680 | Same |
| SWM-08 | 07/25/00 | 2100; 3930 | Same |
| SWM-08 | 08/16/00 | 2200; 3860 | Same |
| SWM-08 | 09/06/00 | 2000; 3590 | Same |
| SWM-08 | 10/27/00 | 3000 | Same |
| SWM-08 | 11/16/00 | 2800 | Same |
| SWM-08 | 12/11/00 | 3000 | Same |
| SWM-08 | 01/17/01 | 2400 | Same |
| SWM-08 | 02/28/01 | 2000 | Same |

Meridian Gold Inc.
June 1, 2005
Page 24 of 36

| | | | |
|---|---|---|---|
| SWM-08 | 03/23/01 | 2600 | Same |
| SWM-08 | 04/27/01 | 2000 | Same |
| SWM-08 | 05/15/01 | 2300 | Same |
| SWM-08 | 07/17/01 | 3200 | Same |
| SWM-08 | 08/21/01 | 3600 | Same |
| SWM-08 | 09/24/01 | 3200 | Same |
| SWM-08 | 12/20/01 | 2000 | Same |
| SWM-08 | 01/23/02 | 1600 | Same |
| SWM-08 | 02/26/02 | 1100 | Same |
| SWM-08 | 03/25/02 | 940 | Same |
| SWM-08 | 04/16/02 | 1200 | Same |
| SWM-08 | 01/08/03 | 2000 | Same |
| SWM-08 | 03/20/03 | 1700 | Same |
| SWM-08 | 02/27/04 | 1050 | Same |
| SWM-09 | 01/17/01 | 760 | Same |
| SWM-09 | 02/27/01 | 340 | Same |
| SWM-09 | 03/22/01 | 510 | Same |
| SWM-09 | 12/20/01 | 440 | Same |
| SWM-09 | 01/23/02 | 500 | Same |
| SWM-09 | 02/26/02 | 360 | Same |
| SWM-09 | 03/25/02 | 240 | Same |
| SWM-09 | 04/18/02 | 420 | Same |
| SWM-09 | 01/09/03 | 700 | Same |
| SWM-09 | 03/20/03 | 450 | Same |
| SWM-09 | 04/21/03 | 850 | Same |
| SWM-09 | 12/30/03 | 360 | Same |
| SWM-09 | 01/27/04 | 1200 | Same |
| SWM-10 | 05/16/00 | 1680 | Same |
| SWM-10 | 06/14/00 | 1950 | Same |
| SWM-10 | 06/14/00 | 1950 | Same |
| SWM-10 | 07/11/00 | 1600; 2100 | Same |
| SWM-10 | 08/16/00 | 1300; 2300 | Same |
| SWM-10 | 09/06/00 | 1020; 1880 | Same |
| SWM-10 | 10/04/00 | 1100; 1810 | Same |
| SWM-10 | 11/13/00 | 1050 | Same |
| SWM-10 | 12/11/00 | 1200 | Same |
| SWM-10 | 01/15/01 | 570 | Same |
| SWM-10 | 02/28/01 | 380 | Same |
| SWM-10 | 03/23/01 | 1200 | Same |

Meridian Gold Inc.
June 1, 2005
Page 25 of 36

| | | | |
|---|---|---|---|
| SWM-10 | 04/27/01 | 1050 | Same |
| SWM-10 | 05/15/01 | 1400 | Same |
| SWM-10 | 07/17/01 | 1850 | Same |
| SWM-10 | 08/21/01 | 2100 | Same |
| SWM-10 | 09/24/01 | 1800 | Same |
| SWM-10 | 10/25/01 | 1800 | Same |
| SWM-10 | 11/29/01 | 1600 | Same |
| SWM-10 | 12/20/01 | 380 | Same |
| SWM-10 | 01/28/02 | 360 | Same |
| SWM-10 | 02/26/02 | 440 | Same |
| SWM-10 | 03/25/02 | 250 | Same |
| SWM-10 | 04/16/02 | 1000 | Same |
| SWM-10 | 05/28/02 | 1700 | Same |
| SWM-10 | 06/10/02 | 1800 | Same |
| SWM-10 | 07/09/02 | 2000 | Same |
| SWM-10 | 08/29/02 | 1800 | Same |
| SWM-10 | 09/24/02 | 1700 | Same |
| SWM-10 | 10/30/02 | 1600 | Same |
| SWM-10 | 11/13/02 | 1350 | Same |
| SWM-10 | 12/05/02 | 1500 | Same |
| SWM-10 | 01/06/03 | 540 | Same |
| SWM-10 | 02/11/03 | 1500 | Same |
| SWM-10 | 03/20/03 | 590 | Same |
| SWM-10 | 04/21/03 | 1400 | Same |
| SWM-10 | 05/30/03 | 1400 | Same |
| SWM-10 | 06/10/03 | 1500 | Same |
| SWM-10 | 07/29/03 | 2200 | Same |
| SWM-10 | 09/02/03 | 3000 | Same |
| SWM-10 | 09/29/03 | 1900 | Same |
| SWM-10 | 10/29/03 | 1800 | Same |
| SWM-10 | 11/25/03 | 1600 | Same |
| SWM-10 | 12/30/03 | 200 | Same |
| SWM-10 | 01/13/04 | 840 | Same |
| SWM-10 | 03/30/04 | 1200 | Same |
| SWM-10 | 04/19/04 | 1800 | Same |
| SWM-10 | 05/27/04 | 1400 | Same |
| SWM-10 | 06/14/04 | 1200 | Same |
| SWM-10 | 07/14/04 | 3100 | Same |
| SWM-10 | 08/30/04 | 4000 | Same |

Meridian Gold Inc.
June 1, 2005
Page 26 of 36

| SWM-10 | 09/13/04 | 3600 | Same |
|---|---|---|---|
| TSWM-01 | 07/25/00 | 1200; 2240 | Same |
| TSWM-01 | 08/16/00 | 2430 | Same |
| TSWM-02 | 12/11/00 | 3200 | Same |
| TSWM-02 | 01/15/01 | 2800 | Same |
| TSWM-02 | 02/28/01 | 1000 | Same |
| TSWM-02 | 03/23/01 | 1600 | Same |
| TSWM-02 | 04/26/01 | 1500 | Same |
| TSWM-02 | 01/23/02 | 700 | Same |
| TSWM-02 | 03/25/02 | 380 | Same |
| TSWM-02 | 04/16/02 | 1000 | Same |
| TSWM-02 | 01/08/03 | 1300 | Same |
| TSWM-02 | 03/20/03 | 1300 | Same |
| TSWM-02 | 04/21/03 | 1600 | Same |
| TSWM-02 | 12/30/03 | 1600 | Same |
| TSWM-02 | 01/22/04 | 1300 | Same |
| TSWM-02 | 02/27/04 | 290 | Same |

Meridian Gold Inc.
June 1, 2005
Page 27 of 36

# APPENDIX B --Total Dissolved Solids Violations

| Monitoring Location | Date | TDS Concentration (mg/L) | Water Quality Standard, Criterion, or Benchmark (mg/L) |
|---|---|---|---|
| SWM-02 | 05/16/00 | 2150 | 500 mg/L (max for 3 day avg); 460 mg/L (agriculture WQ criterion); 385 mg/L (annual avg), and/or 250 mg/L to 400 mg/L (objective) |
| SWM-02 | 01/15/01 | 3310 | Same |
| SWM-02 | 02/28/01 | 2360 | Same |
| SWM-02 | 03/23/01 | 2790 | Same |
| SWM-02 | 04/27/01 | 3080 | Same |
| SWM-02 | 11/29/01 | 6290 | Same |
| SWM-02 | 12/20/01 | 3910 | Same |
| SWM-02 | 01/28/02 | 3840 | Same |
| SWM-02 | 04/16/02 | 3920 | Same |
| SWM-02 | 05/28/02 | 5300 | Same |
| SWM-02 | 11/13/02 | 7750 | Same |
| SWM-02 | 12/05/02 | 6990 | Same |
| SWM-02 | 01/06/03 | 4090 | Same |
| SWM-02 | 02/11/03 | 4930 | Same |
| SWM-02 | 03/20/03 | 3680 | Same |
| SWM-02 | 04/08/03 | 4030 | Same |
| SWM-02 | 12/30/03 | 3570 | Same |
| SWM-02 | 01/13/04 | 4180 | Same |
| SWM-02 | 02/27/04 | 2150 | Same |
| SWM-08 | 05/16/00 | 2870 | Same |
| SWM-08 | 06/14/00 | 3540 | Same |
| SWM-08 | 07/25/00 | 3900 | Same |
| SWM-08 | 08/16/00 | 3890 | Same |
| SWM-08 | 09/06/00 | 3680 | Same |
| SWM-08 | 10/27/00 | 3490 | Same |
| SWM-08 | 11/16/00 | 3010 | Same |
| SWM-08 | 12/11/00 | 3060 | Same |
| SWM-08 | 01/17/01 | 2550 | Same |
| SWM-08 | 02/28/01 | 1810 | Same |
| SWM-08 | 03/23/01 | 2640 | Same |
| SWM-08 | 04/27/01 | 3020 | Same |

Meridian Gold Inc.
June 1, 2005
Page 28 of 36

| | | | |
|---|---|---|---|
| SWM-08 | 05/15/01 | 3250 | Same |
| SWM-08 | 06/20/01 | 3760 | Same |
| SWM-08 | 07/17/01 | 3830 | Same |
| SWM-08 | 08/21/01 | 3570 | Same |
| SWM-08 | 12/20/01 | 1660 | Same |
| SWM-08 | 01/23/02 | 1830 | Same |
| SWM-08 | 04/16/02 | 1260 | Same |
| SWM-08 | 01/08/03 | 1820 | Same |
| SWM-08 | 03/20/03 | 1560 | Same |
| SWM-08 | 02/27/04 | 1050 | Same |
| SWM-09 | 01/17/01 | 510 | Same |
| SWM-09 | 01/27/04 | 1040 | Same |
| SWM-10 | 05/16/00 | 1320 | Same |
| SWM-10 | 06/14/00 | 1480 | Same |
| SWM-10 | 06/14/00 | 1500 | Same |
| SWM-10 | 07/11/00 | 1720 | Same |
| SWM-10 | 08/16/00 | 1760 | Same |
| SWM-10 | 09/06/00 | 1470 | Same |
| SWM-10 | 10/04/00 | 1240 | Same |
| SWM-10 | 11/13/00 | 2330 | Same |
| SWM-10 | 12/11/00 | 850 | Same |
| SWM-10 | 03/23/01 | 860 | Same |
| SWM-10 | 04/27/01 | 850 | Same |
| SWM-10 | 05/15/01 | 1320 | Same |
| SWM-10 | 06/20/01 | 1500 | Same |
| SWM-10 | 07/17/01 | 1460 | Same |
| SWM-10 | 08/21/01 | 1390 | Same |
| SWM-10 | 08/21/01 | 1360 | Same |
| SWM-10 | 10/25/01 | 1240 | Same |
| SWM-10 | 11/29/01 | 1130 | Same |
| SWM-10 | 04/16/02 | 1010 | Same |
| SWM-10 | 05/28/02 | 1330 | Same |
| SWM-10 | 06/10/02 | 1490 | Same |
| SWM-10 | 07/09/02 | 1720 | Same |
| SWM-10 | 08/29/02 | 1400 | Same |
| SWM-10 | 09/24/02 | 1360 | Same |
| SWM-10 | 10/30/02 | 1230 | Same |
| SWM-10 | 11/13/02 | 1010 | Same |
| SWM-10 | 12/05/02 | 1150 | Same |

Meridian Gold Inc.
June 1, 2005
Page 29 of 36

| | | | |
|---|---|---|---|
| SWM-10 | 02/11/03 | 1270 | Same |
| SWM-10 | 04/21/03 | 920 | Same |
| SWM-10 | 05/30/03 | 1280 | Same |
| SWM-10 | 06/10/03 | 1350 | Same |
| SWM-10 | 07/29/03 | 1930 | Same |
| SWM-10 | 09/02/03 | 1820 | Same |
| SWM-10 | 09/29/03 | 1600 | Same |
| SWM-10 | 10/29/03 | 1630 | Same |
| SWM-10 | 11/25/03 | 1450 | Same |
| SWM-10 | 01/13/04 | 600 | Same |
| SWM-10 | 03/30/04 | 1110 | Same |
| SWM-10 | 04/19/04 | 1690 | Same |
| SWM-10 | 05/27/04 | 1840 | Same |
| SWM-10 | 06/14/04 | 1880 | Same |
| SWM-10 | 07/14/04 | 2500 | Same |
| SWM-10 | 08/30/04 | 2840 | Same |
| SWM-10 | 09/13/04 | 3050 | Same |
| TSWM-01 | 05/16/00 | 1320 | Same |
| TSWM-01 | 07/25/00 | 1750 | Same |
| TSWM-01 | 08/16/00 | 1910 | Same |
| TSWM-02 | 05/16/00 | 1870 | Same |
| TSWM-02 | 12/11/00 | 3200 | Same |
| TSWM-02 | 01/15/01 | 2510 | Same |
| TSWM-02 | 02/28/01 | 660 | Same |
| TSWM-02 | 03/23/01 | 1310 | Same |
| TSWM-02 | 04/26/01 | 1590 | Same |
| TSWM-02 | 01/23/02 | 550 | Same |
| TSWM-02 | 04/16/02 | 1040 | Same |
| TSWM-02 | 01/08/03 | 930 | Same |
| TSWM-02 | 03/20/03 | 970 | Same |
| TSWM-02 | 04/21/03 | 1100 | Same |
| TSWM-02 | 12/30/03 | 1110 | Same |
| TSWM-02 | 01/22/04 | 1040 | Same |

Meridian Gold Inc.
June 1, 2005
Page 30 of 36

## **APPENDIX C – Sulfate Violations**

| Monitoring Location | Date | Sulfate Concentration (mg/L) | Water Quality Standard, Criterion, or Benchmark (mg/L) |
|---|---|---|---|
| | | | 250 mg/L (secondary MCL) and/or 500 mg/L |
| SWM-02 | 05/16/00 | 1050 | (primary MCL) |
| SWM-02 | 01/15/01 | 1620 | Same |
| SWM-02 | 04/27/01 | 1560 | Same |
| SWM-02 | 04/27/01 | 1560 | Same |
| SWM-02 | 01/28/02 | 2380 | Same |
| SWM-02 | 04/16/02 | 2260 | Same |
| SWM-02 | 01/06/03 | 2280 | Same |
| SWM-02 | 04/08/03 | 2020 | Same |
| SWM-02 | 01/13/04 | 2420 | Same |
| SWM-08 | 05/16/00 | 1650 | Same |
| SWM-08 | 06/14/00 | 2130 | Same |
| SWM-08 | 07/25/00 | 2300 | Same |
| SWM-08 | 08/16/00 | 2250 | Same |
| SWM-08 | 09/06/00 | 2310 | Same |
| SWM-08 | 10/27/00 | 1960 | Same |
| SWM-08 | 01/17/01 | 1420 | Same |
| SWM-08 | 04/27/01 | 1800 | Same |
| SWM-08 | 07/17/01 | 2180 | Same |
| SWM-08 | 01/23/02 | 1080 | Same |
| SWM-08 | 04/16/02 | 660 | Same |
| SWM-08 | 01/08/03 | 1100 | Same |
| SWM-09 | 01/27/04 | 580 | Same |
| SWM-10 | 05/16/00 | 720 | Same |
| SWM-10 | 06/14/00 | 830 | Same |
| SWM-10 | 06/14/00 | 810 | Same |
| SWM-10 | 07/11/00 | 890 | Same |
| SWM-10 | 08/16/00 | 890 | Same |
| SWM-10 | 09/06/00 | 700 | Same |
| SWM-10 | 10/04/00 | 550 | Same |
| SWM-10 | 04/27/01 | 440 | Same |
| SWM-10 | 07/17/01 | 690 | Same |
| SWM-10 | 10/25/01 | 500 | Same |
| SWM-10 | 04/16/02 | 540 | Same |

Meridian Gold Inc.
June 1, 2005
Page 31 of 36

| SWM-10 | 07/09/02 | 850 | Same |
|--------|----------|-----|------|
| SWM-10 | 10/30/02 | 500 | Same |
| SWM-10 | 04/21/03 | 400 | Same |
| SWM-10 | 07/29/03 | 870 | Same |
| SWM-10 | 10/29/03 | 640 | Same |
| SWM-10 | 01/13/04 | 310 | Same |
| SWM-10 | 04/19/04 | 950 | Same |
| SWM-10 | 07/14/04 | 1210 | Same |
| TSWM-01 | 07/25/00 | 910 | Same |
| TSWM-02 | 01/15/01 | 1240 | Same |
| TSWM-02 | 04/26/01 | 780 | Same |
| TSWM-02 | 04/16/02 | 540 | Same |
| TSWM-02 | 01/08/03 | 390 | Same |
| TSWM-02 | 04/21/03 | 410 | Same |

Meridian Gold Inc.
June 1, 2005
Page 32 of 36

## APPENDIX D – Arsenic Violations

| Monitoring Location | Date | Arsenic Concentration (µg/L) | Water Quality Standard, Criterion, or Benchmark (µg/L) |
|---|---|---|---|
| | | | 0.004 µg/L (OEHHA public health goal for drinking water);  0.05 µg/L (inorganic oxides) (OEHHA maximum allowable dose level ["MADL"]); and/or 0.10 µg/d |
| SWM-02 | 05/16/00 | 5.0 | (OEHHA MADL) |
| SWM-02 | 01/15/01 | 3.0 | Same |
| SWM-02 | 04/27/01 | 6.0 | Same |
| SWM-02 | 04/27/01 | 6.0 | Same |
| SWM-02 | 01/28/02 | 5.0 | Same |
| SWM-02 | 04/16/02 | 5.0 | Same |
| SWM-02 | 01/06/03 | 4.0 | Same |
| SWM-02 | 04/08/03 | 5.0 | Same |
| SWM-02 | 01/13/04 | 6.0 | Same ) |
| SWM-08 | 05/16/00 | 1.0 | Same ) |
| SWM-08 | 06/14/00 | 2.0 | Same ) |
| SWM-08 | 07/25/00 | 2.0 | Same |
| SWM-08 | 08/16/00 | 2.0 | Same |
| SWM-08 | 09/06/00 | 1.0 | Same |
| SWM-08 | 10/27/00 | 3.0 | Same |
| SWM-08 | 01/17/01 | 2.0 | Same |
| SWM-08 | 07/17/01 | 2.0 | Same |
| SWM-08 | 01/23/02 | 1.0 | Same |
| SWM-08 | 04/16/02 | 1.0 | Same |
| SWM-08 | 01/08/03 | 2.4 | Same |
| SWM-09 | 01/17/01 | 4.0 | Same |
| SWM-09 | 01/23/02 | 1.0 | Same |
| SWM-09 | 04/18/02 | 2.0 | Same |
| SWM-09 | 01/09/03 | 2.0 | Same |
| SWM-09 | 04/21/03 | 4.2 | Same |
| SWM-09 | 01/27/04 | 2.2 | Same |
| SWM-10 | 05/16/00 | 7.0 | Same |
| SWM-10 | 06/14/00 | 7.0 | Same |
| SWM-10 | 06/14/00 | 6.0 | Same |
| SWM-10 | 07/11/00 | 9.0 | Same |
| SWM-10 | 08/16/00 | 9.0 | Same |

Meridian Gold Inc.
June 1, 2005
Page 33 of 36

| SWM-10 | 09/06/00 | 9.0 | Same |
| SWM-10 | 10/04/00 | 7.0 | Same |
| SWM-10 | 01/15/01 | 2.0 | Same |
| SWM-10 | 04/27/01 | 4.0 | Same |
| SWM-10 | 07/17/01 | 12.0 | Same |
| SWM-10 | 10/25/01 | 8.0 | Same |
| SWM-10 | 01/28/02 | 2.0 | Same |
| SWM-10 | 04/16/02 | 2.0 | Same |
| SWM-10 | 07/09/02 | 8.0 | Same |
| SWM-10 | 10/30/02 | 6.2 | Same |
| SWM-10 | 01/06/03 | 1.5 | Same |
| SWM-10 | 04/21/03 | 2.4 | Same |
| SWM-10 | 07/29/03 | 11.1 | Same |
| SWM-10 | 10/29/03 | 7.6 | Same |
| SWM-10 | 01/13/04 | 3.2 | Same |
| SWM-10 | 04/19/04 | 4.0 | Same |
| SWM-10 | 07/14/04 | 7.0 | Same |
| TSWM-02 | 01/08/03 | 1.2 | Same |

Meridian Gold Inc.
June 1, 2005
Page 34 of 36

## APPENDIX E – Selenium Violations

| Monitoring Location | Date | Selenium Concentration ($\mu$g/L) | Water Quality Standard, Criterion, or Benchmark ($\mu$g/L) |
|---|---|---|---|
| SWM-02 | 01/28/02 | 31.0 | 5.0 |
| SWM-02 | 04/16/02 | 11.0 | Same |
| SWM-02 | 01/06/03 | 7.0 | Same |
| SWM-02 | 01/13/04 | 9.0 | Same |
| SWM-08 | 05/16/00 | 10.0 | Same |
| SWM-08 | 06/14/00 | 9.0 | Same |
| SWM-08 | 07/25/00 | 7.0 | Same |
| SWM-08 | 08/16/00 | 7.0 | Same |
| SWM-08 | 09/06/00 | 7.0 | Same |
| SWM-08 | 10/27/00 | 7.0 | Same |
| SWM-08 | 01/17/01 | 6.0 | Same |
| SWM-08 | 04/27/01 | 9.0 | Same |
| SWM-08 | 07/17/01 | 6.0 | Same |
| SWM-09 | 01/17/01 | 6.0 | Same |
| TSWM-01 | 04/11/00 | 9.0 | Same |

Meridian Gold Inc.
June 1, 2005
Page 35 of 36

## APPENDIX F – Nitrate+Nitrite Violations

| Discharge Location | Date | Nitrate+Nitrite Concentration (mg/l as N) | Water Quality Standard, Criterion, or Benchmark (mg/L as N) |
|---|---|---|---|
| SWM-02 | 01/15/01 | 2.57 | 0.68 |
| SWM-08 | 07/25/00 | 17.9 | 0.68 |
| SWM-08 | 08/16/00 | 18.5 | 0.68 |
| SWM-08 | 09/06/00 | 18.3 | 0.68 |
| SWM-08 | 10/27/00 | 20.2 | 0.68 |
| SWM-08 | 01/17/01 | 16.5 | 0.68 |
| SWM-08 | 04/27/01 | 15.3 | 0.68 |
| SWM-10 | 01/15/01 | 0.79 | 0.68 |
| TSWM-02 | 01/15/01 | 8.4 | 0.68 |
| TSWM-02 | 04/26/01 | 3.36 | 0.68 |

Meridian Gold Inc.
June 1, 2005
Page 36 of 36

## SERVICE LIST
(by certified mail – return receipt requested)

Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, California, 94105

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Celeste Cantú, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Thomas Pinkos, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

Bill Lockyer, Attorney General
Office of the Attorney General
1300 "I" Street
P.O. Box 944255
Sacramento, CA 94244-2550

Proposition 65 Enforcement Reporting
Attention: Prop 65 Coordinator
1515 Clay Street, Suite 2000
Post Office Box 70550
Oakland, California 94612-0550

Jeffrey Tuttle
Calaveras County District Attorney
891 Mountain Ranch Road
San Andreas, California 95249

National Registered Agents, Inc.
2030 Main Street, Suite 1030
Irvine, CA 92614

B.B. Blevins, Director
Department of Toxic Substances Control
Headquarters
P.O. Box 806
Sacramento, CA 95812-0806

Mark Leary, Executive Director
California Integrated Waste Management
Board
P.O. Box 4025
Sacramento, CA 95812-4025

**Exhibit**

**C**

**CSPA's Scientific Experts' Hourly Rates**
**for the Year 2006**

| NAME | HOURLY RATE |
|---|---|
| Clayton Creager | $140 |
| Karen Summers | $159 |
| Bill Mills | $141 |
| Katerine Heidel | $90 |
| Bob Johns | $130 |
| Chih-Fang Chung | $82 |
| Amber Genteman | $65 |
| Gary Wortham | $95 |
| Rhonda Carlisle | $88 |
| Jim Kuipers | $125 |

**EXHIBIT C**

# Exhibit

# D

**Storm Water Monitoring Program**
**Royal Mountain King Mine Site**

Meridian will implement the storm water monitoring program described below:

**Sampling Locations**

Meridian will conduct sampling at the seven locations described below, which are also indicated on the attached map:

- Runoff Channel on West Side of West ODS above Sump #2 (No. 1)
- Runoff Channel draining East Side of West ODS above Sump #2 (No. 2)
- Runoff Channel on West Side of West ODS above Sump #5 (No. 3)
- Runoff Channel draining former Gold Knoll Pit above Gold Knoll seep area (No. 4)
- Runoff Channel on Gold Knoll ODS at confluence of drains before crossing road (No. 5)
- Runoff Channel on North Side of Gold Knoll ODS before ponded area next to road (No. 6)
- Runoff Channel on the South Side of the FTR ODS (No. 7)

**Sampling Parameters**

Meridian will monitor the following parameters:

TDS
TSS
Alkalinity (as Carbonate, Bicarbonate, and Hydroxide)
Major Cations (Na, Ca, K, Mg)
Major Anions (Cl, $NO_3$, $SO_4$)
Total and Dissolved Metals with filtering performed in the analytical laboratory (As, Se, T Cr, Ni, Zn)
Total and Dissolved Organic Carbon
Temperature (field parameter)
Specific Conductivity (field parameter)
pH (field parameter)
Flow (field parameter)

**Sampling Frequency**

Meridian will attempt to collect samples from each location during two storms with >0.25" of precipitation during each of the 2005/2006 and 2006/2007 wet seasons. Every effort will be made to collect all samples during the same rainfall event(s). If a location does not get sampled because of access problems or cessation of precipitation, a sample will be collected during a suitable subsequent event. If two sampling events cannot be accomplished during the 2005/2006 wet season, additional sampling events shall occur during the 2006/2007 wet season so that a total of four sampling events occur during these two wet seasons. During the 2006/2007 wet season, samples will be collected during the first significant qualifying rain event of the season (according to the definitions in the General Industrial Permit) and during at least one other qualifying storm event. All sampling will be performed during normal business hours.

If a particular sampling location does not exhibit any flows during two consecutive sampling events, Meridian shall no longer be required to conduct sampling at that location.

**EXHIBIT D**

## ORDER

WHEREAS, the Parties have consented to entry of the foregoing Consent Agreement and requested the Court's approval and entry thereof; and

WHEREAS, pursuant to 33 U.S.C. § 1365 and 42 U.S.C. § 6972(b)(2)(F), Plaintiff California Sportfishing Protection Alliance ("CSPA") has served the complaint herein on the United States Attorney General and the Administrator of the United States Environmental Protection Agency;

WHEREAS, pursuant to 33 U.S.C. § 1365(c)(3), at least 45 days have elapsed since the United States Attorney General was served on April 18, 2006, and the Administrator of the United States Environmental Protection Agency was served on April 18, 2006 with copies of the Consent Agreement; and

WHEREAS, pursuant to California Health & Safety Code § 25249.7(f), Plaintiff California Sportfishing Protection Alliance has submitted to the California Attorney General a reporting form enclosing the Consent Agreement as specified therein; and

WHEREAS, the Court has reviewed the Consent Agreement, and fully considered all comments received thereon to date from the Parties hereto, the United States Attorney General, the United States Environmental Protection Agency and the California Attorney General; and

WHEREAS, the Court has fully considered the Parties' request to enter this Consent Agreement as an order; and

WHEREAS, the Court finds the Consent Agreement to be: (1) fair, adequate and reasonable; (2) consistent with applicable laws; and (3) protective of the public interest; and

WHEREAS, the Court further specifically finds, for purposes of California Health & Safety Code §§ 25249.5 and 25249.7(f), that: (1) the mitigation payments in lieu of penalties in Paragraphs 15 and 16 of the Consent Agreement are reasonable and appropriate in light of the statutory criteria set forth in § 25249.7(b)(2); and (2) the attorneys' fee award payment in Paragraph 19 of the Consent Agreement is reasonable under California law; and

WHEREAS, good cause appearing therefor,

1.     THIS CONSENT AGREEMENT AND ORDER IS HEREBY APPROVED AND
JUDGMENT IS ENTERED IN ACCORDANCE THEREWITH; and

2.     This Court shall retain and have jurisdiction over CSPA and Meridian Gold Company,
Inc. with respect to implementation of the terms of their Consent Agreement and the resolution of any
disputes that may arise under that Consent Agreement, as provided therein.

Dated: ⟨June 8⟩, 2006

Robert E. Coyle
United States District Court Judge